**Cyndia A. MORRIS, Appellant,**

v.

**WELLS FARGO BANK, N.A., Appellee.**

**No. 05–09–01013–CV.**

Court of Appeals of Texas,
Dallas.

Feb. 25, 2011.

---

———

Eric Gordon Walraven, Hiersche, Hayward, Drakeley & Urbach, P.C., Addison, TX, for Appellant.

Britton Lee Larison, Randall Lynn Telford, Irving, TX, for Appellee.

Before Justices RICHTER, LANG, and MYERS.

**OPINION**

Opinion By Justice LANG.

In this case, appellant Cyndia A. Morris challenges two deeds by which she allegedly conveyed her residence, claiming her signature was forged. Following a bench trial, the trial court signed a judgment in which, in relevant part to this appeal, it "ordered, adjudged, and decreed" that title to the property described in one of the disputed deeds was vested in appellee Wells Fargo Bank, N.A. ("Wells Fargo") and that the other disputed deed was void due to forgery. Specifically, at trial and on appeal, Morris contends Wells Fargo, a successor in interest to transferees under the first of the disputed deeds described in the judgment, had no right to foreclose pursuant to a deed of trust and thereby claim title.

In two issues on appeal, Morris asserts Wells Fargo's foreclosure of the property at issue was "improper" because (1) the evidence was legally and factually insufficient to support the trial court's finding that the signature of Morris on the deed at issue was "genuine" and (2) the deed at issue was void as a result of alleged fraud by the notary. We decide Morris's two issues against her. The trial court's judgment is affirmed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The parties do not dispute that on April 3, 2005, Morris owned and resided at the property at issue, 2323 St. Francis Avenue in Dallas County (the "property"). Additionally, the parties agree that subsequent to that date, two deeds pertaining to the property and purportedly executed by Morris were filed in Dallas County. One of those deeds, entitled "General Warranty Deed," purported to convey all of the property, except a two-foot strip, to Executive Development and Planning Company ("EDPC"), an entity controlled by Curtis Bailey ("C. Bailey"). That deed (the "April 4 deed") was allegedly notarized on April 4, 2005, by notary Taulease Bailey ("T. Bailey"), a sister of C. Bailey. The signature on the April 4 deed appeared as "Cyndia A. Morris." The other deed, entitled "Correction General Warranty Deed," purported to convey to EDPC the entirety of the property and was allegedly notarized on April 18, 2005, by notary Franklin Brown (the "April 18 deed"). The signature on the April 18 deed appeared as "Cyndia A. Morris as Independent Executrix." Morris had engaged in real estate transactions with C. Bailey prior to the dates referenced on those deeds.

On April 26, 2005, EDPC purportedly conveyed the property to Richard Jordan. On that same date, Jordan borrowed $152,000 from Argent Mortgage Company, LLC, a predecessor in interest to Wells Fargo, and secured that loan by a deed of trust purporting to create a lien on the property. Subsequently, Jordan defaulted on the loan. On March 7, 2006, Wells Fargo, as assignee of Argent Mortgage Company, LLC, foreclosed on the property.

Morris sued C. Bailey[1] and Wells Fargo, seeking, in relevant part, a declaratory judgment that both deeds described above "are null and void, as such deeds are a forgery, and that [Morris] is the true and lawful owner of said real property, free and clear of any and all liens." Additionally, Morris asserted a fraud claim against C. Bailey. Wells Fargo filed a general denial answer and asserted, *inter alia,* an affirmative defense that it is "a bona fide mortgagee."

After a bench trial, the trial court signed findings of fact that stated, in relevant part, (1) "[o]n April 4, 2005, [Morris] executed a General Warranty Deed conveying the Property to [EDPC]," with the exception of the two-foot strip not included in the property description in that deed; (2) Wells Fargo's predecessor loaned money to Jordan in good faith and without any knowledge of Morris's claims to the property; (3) the property described in the April 4 deed was conveyed to Wells Fargo by a March 7, 2006 substitute trustee's deed following Wells Fargo's foreclosure of its interest in such property; (4) the signature of Morris on the April 4 deed is "genuine"; and (5) the signature of Morris on the April 18 deed is "not genuine and is a forgery." In its conclusions of law, the trial court concluded, in relevant part, (1) C. Bailey committed fraud against Morris in obtaining Morris's signature on the April 4 deed; (2) Wells Fargo is a bona fide lender as to the claims of Morris pertaining to the April 4 deed; (3) the April 4 deed is valid and conveyed the property to EDPC, except for the two-foot strip described above; (4) the April 18 deed is void; and (5) pursuant to the March 7, 2006 substitute trustee's deed,

Wells Fargo was vested with title to the property described in the April 4 deed.

The trial court signed a final judgment dated May 27, 2009, in which it "found," in part, (1) C. Bailey committed fraud against Morris in obtaining Morris's signature on the April 4 deed, (2) C. Bailey committed a forgery of Morris's signature on the April 18 deed, and (3) Wells Fargo is a bona fide lender and loaned money to Jordan in good faith and without knowledge of Morris's claims to the property. Additionally, the trial court "ordered, adjudged and decreed" that, *inter alia,* (1) the April 4 deed was valid; (2) the April 18 deed was void; (3) pursuant to a March 7, 2006 substitute trustee's deed, "the property vested in [Wells Fargo]," with the exception of the two-foot strip not conveyed in the April 4 deed; and (4) Morris take nothing against Wells Fargo. This appeal timely followed.

## II. VALIDITY OF THE APRIL 4 DEED

In Morris's first issue, she asserts that the evidence was legally and factually insufficient to support the trial court's finding that her signature on the April 4 deed was "genuine." In her second issue, Morris specifically contends that because "[t]he clear and unmistakable evidence presented at trial established that the notary of the April 4 deed fraudulently obtained the signature of Morris on such deed," the "validity of the certificate of acknowledgment was overcome" and the April 4 deed was "void."

Wells Fargo responds, "The evidence presented at trial was sufficient to support the trial court's judgment that [Morris] signed the April 4 deed, that [Wells Fargo] was a bona fide mortgagee and title to property as described in the April 4 deed

---

1. Specifically, Morris named as a defendant "Curtis Bailey d/b/a Executive Planning & Development Company."

is vested in [Wells Fargo]." Further, Wells Fargo asserts "[Morris's] argument that the April 4 deed is void *ab initio* as a result of fraud is contrary to Texas law."

## A. Standard of Review

We review a trial court's conclusions of law de novo. *BMC Software Belg., N.V. v. Marchand,* 83 S.W.3d 789, 794 (Tex.2002). Findings of fact in a nonjury trial have the same force and dignity as a jury's verdict. *See, e.g., Lewis v. Dallas Soundstage, Inc.,* 167 S.W.3d 906, 912 (Tex.App.-Dallas 2005, no pet.) (citing *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994)). When, as here, a complete reporter's record is filed, the trial court's fact findings may be reviewed for legal and factual sufficiency under the same standards as jury verdicts. *Id.*

When we review legal sufficiency, we review the evidence in a light that tends to support the finding of the disputed facts and disregard all evidence and inferences to the contrary. *Lee Lewis Constr., Inc. v. Harrison,* 70 S.W.3d 778, 782 (Tex.2001). We must credit the favorable evidence if reasonable jurors could and disregard the contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). If there is more than a scintilla of evidence to support the finding, the legal sufficiency challenge fails. *See, e.g., Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998); *see also King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex.2003) (more than scintilla of evidence exists when evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions"). When a party attacks the legal sufficiency of an adverse finding on an issue for which she has the burden of proof, she must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989). In reviewing a "matter of law" challenge, the reviewing court must first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 241 (Tex.2001) (citing *Sterner,* 767 S.W.2d at 690). If there is no evidence to support the finding, the reviewing court will then examine the entire record to determine if the contrary proposition is established as a matter of law. *Id.* The point of error should be sustained only if the contrary position is conclusively established. *Id.*

When a party attacks the factual sufficiency of an adverse finding on an issue on which she has the burden of proof, the court of appeals must consider and weigh all of the evidence and can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1986). The trial judge, as fact finder, is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *See Leyva v. Pacheco,* 163 Tex. 638, 358 S.W.2d 547, 549 (1962). The court of appeals is not a fact finder. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex.1998). Accordingly, the court of appeals may not pass upon the witnesses' credibility or substitute its judgment for that of the trier of fact, even if the evidence would clearly support a different result. *Id.* (citing *Pool,* 715 S.W.2d at 634). "[W]hen reversing a trial court's judgment for factual insufficiency, the court of appeals must detail all the evidence relevant to the issue and clearly state why the jury's finding is factually insufficient or so against the great weight and preponderance of the evidence that it

is manifestly unjust." *Id.* Further, "[t]he court of appeals must explain how the contrary evidence greatly outweighs the evidence supporting the verdict." *Id.; accord Herbert v. Herbert,* 754 S.W.2d 141, 142 (Tex.1988) (courts of appeals are not entitled to reverse "merely because they conclude that the evidence preponderates toward an affirmative answer"; rather, reversal is warranted "only after a detailing of evidence under the *Pool* criteria indicates that the great weight of that evidence supports an affirmative answer"); *see also Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761–62 (Tex. 2003) (discussing *Pool* and its progeny).

### B. Applicable Law

██ A void instrument passes no title, and the fact that the grantee-mortgagee is an innocent purchaser makes no difference. *1st Coppell Bank v. Smith,* 742 S.W.2d 454, 461 (Tex.App.-Dallas 1987, no writ), *disapproved on other grounds, Fortune Prod. Co. v. Conoco, Inc.,* 52 S.W.3d 671, 678 (Tex.2000). A forged deed is void *ab initio. See Dwairy v. Lopez,* 243 S.W.3d 710, 712 (Tex.App.-San Antonio 2007, no pet.) (citing *Hennessy v. Blair,* 107 Tex. 39, 173 S.W. 871, 874 (1915)); *see also Commonwealth Land Title Ins. Co. v. Nelson,* 889 S.W.2d 312, 318 (Tex.App.-Houston [14th Dist.] 1994, writ denied) ("when a document is void or void *ab initio* it is as if it did not exist because it has no effect from the outset"). However, deeds obtained by fraud are voidable rather than void, and remain effective until set aside. *Ford v. Exxon Mobil Chem. Co.,* 235 S.W.3d 615, 618 (Tex.2007) (citing *Nobles v. Marcus,* 533 S.W.2d 923, 926 (Tex. 1976)). The law is settled that a certificate of acknowledgment is prima facie evidence that the grantor appeared before the notary and executed the deed in question for the purposes and consideration therein expressed. *Bell v. Sharif–Munir–Davidson Dev. Corp.,* 738 S.W.2d 326, 330 (Tex.App.-Dallas 1987, writ denied); *see also Stout v. Oliveira,* 153 S.W.2d 590, 596 (Tex.Civ. App.-El Paso 1941, writ ref'd w.o.m.) (burden of proof is on party who denies genuineness of acknowledgment and instrument). "Clear and unmistakable proof that either the grantor did not appear before the notary or that the notary practiced some fraud or imposition upon the grantor is necessary to overcome the validity of a certificate of acknowledgment." *Bell,* 738 S.W.2d at 330.

### C. Testimony Relevant to This Appeal

#### 1. Brown

Morris introduced into evidence excerpts from a May 18, 2007 deposition of Brown. Brown testified he is employed at a tax services business on Grand Avenue in Dallas. He stated he has been a notary public for eight or nine years and his notary commission has never been suspended or revoked. He performs all notary services at his office. Brown testified the April 18 deed appeared to bear his signature and appeared to have been notarized by him. He stated it is his practice to keep a record of all signatures he notarizes, and he could not see how anyone could get his notary materials. His notary record book did not show he had notarized a signature of Morris. He stated he fills out his notary record book ninety-nine percent of the time, but "every once in awhile" he has notarized a signature without recording it. He has never notarized a document in a circumstance where the signer did not sign in front of him or show "who they say they were." If the April 18 deed has his notary stamp on it, it was signed by Morris or a person purporting to be her. He stated he did not "have a clue" why he did not record the notarization of the April 18 deed. Brown could not recall

ever notarizing anything for C. Bailey. He did not remember ever seeing Morris, but was "prepared to testify in court that he actually notarized the signature of [Morris] on April 18, 2005" because the April 18 deed bears his signature and stamp. Brown testified "99.9 percent" of the persons for whom he performs notary services are African–American, and "chances are" he would be more likely to remember notarizing a deed for a white woman than for a black woman. He stated it is possible another woman showed up and represented herself to be Morris. He would have required a "picture ID," which is normally a driver's license, but it is possible he could have accepted false identification. Further, he stated it is possible, and "even probable," that if he was in hurry, that would be the reason he did not record the deed in his record book.

## 2. T. Bailey

Morris introduced into evidence excerpts from a May 18, 2007 deposition of T. Bailey. T. Bailey testified C. Bailey is her brother. T. Bailey stated she has been commissioned as a notary public since July 2004. She stated that when someone asks her to notarize a document, her standard procedure is to look at the document, stamp it, and write it in her record book. If she does not know the signer, she requires identification. She is a "mobile notary" and performs most of her notarizations outside of her office. She stated that sometimes she does not have her book with her and does not record a notarization in the book. She uses her record book seventy percent of the time. T. Bailey said she has never had occasion to notarize a document that was signed outside of her presence.

T. Bailey testified she recognized Morris, whom she knew through her brother. Morris was involved in real estate deals with her brother. T. Bailey prepared three deeds regarding such transactions at her brother's request. She is not an attorney. The three deeds were prepared by her at the same time, sometime prior to September 30, 2004. Each deed named Morris as the grantor and EDPC as the grantee. T. Bailey testified she notarized Morris's signature as to all three deeds. Two of those notarizations were recorded in T. Bailey's record book. One entry was dated September 30, 2004, and the other was dated October 1, 2004. T. Bailey testified she made up a "GF number" that was typed on the deed to which the September 30, 2004 entry pertained. Morris stipulated her signature as to those entries was genuine. T. Bailey charged no fees to Morris.

T. Bailey testified Morris signed the April 4 deed in her presence at Morris's home and she notarized that deed at that time. C. Bailey was not present when Morris signed the April 4 deed. She has no record that she notarized Morris's signature on the April 4 deed. Finally, she was not aware the description on that deed pertained to Morris's home.

## 3. Morris

Morris testified at trial that she received an inheritance in 2001. Her first major purchase was a house on Longview Drive in Mesquite that she purchased as an investment property. After that, she decided to start building and selling houses, but she had no prior experience. Her son mentioned that C. Bailey had experience in building and selling houses and introduced C. Bailey to her at her home in approximately September 2004. She testified C. Bailey told her he knew "where some good land was for the lots" and "had several plans for houses to build." He never showed her any of the plans. He showed her houses he said he had built, and she

took his word that he had built those houses. Morris testified C. Bailey appeared "very honest, very credible," and "knew a lot about the construction business." She did not know anything else about C. Bailey. However, she wanted C. Bailey to build houses and they would split the profits. She testified she had no cash to give him, so she signed two deeds conveying to C. Bailey's company, EDPC, her investment property on Longview Drive and a property on Lake June. She testified the deeds for the Longview and Lake June properties were signed on September 30, 2004, at her house in the presence of C. Bailey and T. Bailey, and T. Bailey notarized both deeds at that time. Morris testified T. Bailey did not visit her house on any other occasion.

C. Bailey paid her nothing for her properties at the time they were conveyed to him. She thought C. Bailey would "either have to sell the property or get a loan against the property" to get money. It did not occur to her that she could get a loan against the properties.

Morris testified that in approximately November or December of 2004, she told C. Bailey that if he was not going to purchase a lot and build a house, he needed to pay her for her houses. Then, in approximately January or February of 2005, she complained to C. Bailey because he had not purchased any land or started construction. By March 2005, she thought C. Bailey lacked credibility and she would not have been willing to enter into another real estate deal with him.

Although C. Bailey never purchased land or built houses pursuant to their agreement, in 2004 and 2005, C. Bailey gave Morris four checks totaling $37,000. She understood the first of those checks to be "profit" and the others to "relate to the houses."

Morris testified that on March 28, 2006, she learned her residence had been sold and she was asked to vacate the property. She said she did not sign the April 4 deed or the April 18 deed. She stated she did not see T. Bailey in 2005 and never visited Brown's office. She contacted a lawyer, then filed formal complaints alleging misconduct by both notaries public. She received a letter from the Texas Secretary of State informing her Brown's notary commission had been suspended for three months as a result of her complaint. She has not received a response to her complaint regarding T. Bailey.

In response to a question from the trial court judge, Morris testified that on the day she executed the deeds for the Longview and Lake June properties in the presence of C. Bailey and T. Bailey, she signed only the two deeds and T. Bailey's notary book and did not sign any other documents. According to Morris, it is not possible that at the time of her transactions with C. Bailey, there were other documents signed by her that she does not recall or did not fully read. Her Lake June property was worth $80,000 and the Longview house was worth $120,000 when they were conveyed to EDPC.

### 4. Jennifer Fenner Masson

Wells Fargo presented testimony of Jennifer Fenner Masson, a forensic document examiner. Morris stipulated Masson was an expert. Masson testified she examined copies of the April 4 and April 18 deeds and a set of six signatures of Morris known to be genuine. Her conclusion was that it is "very probable" the signatures on the two deeds were written by the same person who wrote the known signatures of Morris. In her report, she used the wording "more likely than not or probable." She testified her reservations were (1) she had only photocopies to work with and (2) she had no samples with a middle initial "A," which both deeds showed. She stated that earlier that day at lunch, she had reviewed a document signed by Morris

with a middle initial "A" and found the "A" was made in the same manner as those on the deeds. According to Masson, this "makes the opinion stronger."

In response to questions from the trial court judge, Masson stated the handwritten words "as Independent Executrix" on the April 18 deed were "not the same in style" as the handwriting of C. Bailey or T. Bailey, but looked "very similar" to certain letters in a known signature of Morris. She testified she could not say those words were written by Morris because she had samples only of Morris's signature. Masson testified about the details of Morris's signature she focused on in drawing her conclusions about the signatures on the deeds.

On cross-examination, Masson testified the photocopies of the known signatures were "reasonably good quality." She testified "every time you make a copy of something, you can add to or lose something." She stated that the benefit of using an original document is that "there are a lot of things that can be determined from the original," such as some indications of tracing. Masson stated she prefers to use fifty to 100 samples of a signature in order to "get a good analysis." In this case, there were approximately six. Also, Masson stated there is a benefit to having signatures from the same general time period. She stated none of the comparison signatures in this case were from 2005. Masson testified that some of the ways a signature can be forged are tracing, free hand simulation, and free hand forgery. She did not see any evidence of tracing as to the documents at issue, but the lack of originals was "a limiting factor" with regard to tracing. According to Masson, forensic document examination is not an exact science, and analysts do not always agree as to conclusions. She charges $200 an hour and her fees in this case were being paid by Wells Fargo.

Two days later, the trial court granted a motion by Morris to reopen Masson's testimony. At that time, Masson testified on direct examination that "[t]o trace something without leaving evidence that that is what is done is extremely difficult." She testified tracing can be done by transmitted light, carbon paper, or putting indentations into the paper. Tracing can best be detected by looking at the original document as opposed to a copy. She did not see any evidence of freehand simulation or tracing in this case, but could not rule out either one. According to Masson, "there's a wide range of variety of people's ability" to simulate another's signature and "[t]here are people that certainly can do a better job than others." An original "is always going to provide more information" in detecting freehand simulation. Masson agreed a signature could easily be scanned onto a document and that document could then be photocopied, but she did not see evidence of that in this case. She did not see evidence of digital imaging in this case, but was not able to rule it out.

On cross-examination, Masson testified she did not know of any instance in which she was found to be incorrect as to whether tracing had occurred. She did not see any differences in the handwriting as to the name "Cyndia A. Morris" written on the April 18 deed and the words "as Independent Executrix" on that deed. She did not see any evidence that the signature on the April 18 deed was not written by the same person who wrote the known signatures of Morris.

### D. Application of Law to Facts

#### 1. Sufficiency of the Evidence Respecting the Signature on the April 4 Deed

##### a. Legal Sufficiency

Morris contends she "clearly established all vital facts to her claim that the

signature on the April 4 deed was a forgery." However, when, as here, a party attacks the legal sufficiency of an adverse finding on an issue for which she has the burden of proof, we must first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. *Dow Chem. Co.,* 46 S.W.3d at 241 (citing *Sterner,* 767 S.W.2d at 690). Only if there is no evidence to support the finding do we then examine the entire record to determine if the contrary proposition is established as a matter of law. *Sterner,* 767 S.W.2d at 690.

The record shows T. Bailey testified Morris signed the April 4 deed in her presence. Further, Masson testified it was "very probable" the signature on the April 4 deed was written by the same person who wrote the known signatures of Morris. Thus, there is some evidence in the record to support the finding at issue. *See id.* Morris argues Masson's testimony was "[t]he only real evidence Wells Fargo put forth in an attempt to establish Morris's signature on the deeds was authentic." According to Morris, such testimony was "not believable" because Masson "was only reviewing copies and had only five or six examples of Morris's signature to review." However, Morris does not assert, and the record does not show, Masson's testimony was without probative value. *See 1st Coppell Bank,* 742 S.W.2d at 459 (concluding testimony of document examiner who used two rather than twelve exemplars was not "so speculative or conjectural as to be without probative value"). On this record, we cannot conclude the evidence was legally insufficient to support the trial court's finding that Morris's signature on the April 4 deed was "genuine." *See Sterner,* 767 S.W.2d at 690.

### b. Factual Sufficiency

With respect to factual sufficiency, Morris contends the finding at issue "is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." Morris asserts "it is clear from the undisputed evidence presented at trial that the notary who allegedly notarized Morris's signature on the April 4 deed prepared a phony document, violated the Texas Government Code by failing to record the notarization of such signature in her log book, and that Morris was willing to profess the fact that she did not sign such deed by filing a formal complaint with the Texas State Notary Commission." Further, Morris contends the expert witness reviewed only photocopies and examined fewer than the ideal number of comparison signatures. Additionally, Morris argues she testified that by April 2005, C. Bailey had "abused" her trust and she "would not have done any business with Bailey, let alone sign over her homestead to him." Finally, Morris asserts "the trial court created an irreconcilable conflict by finding the signature on one deed to be a forgery but not the other."

In support of her contention that there is a "conflict" in the trial court's findings, Morris cites *Bender v. Southern Pacific Transportation Co.,* 600 S.W.2d 257 (Tex. 1980). In that case, the court stated that in reviewing findings for conflict, "the threshold question is whether the findings are about the same material fact." *Id.* at 260. Additionally, the court stated "[a] court may not strike down jury answers on the ground of conflict if there is any reasonable basis upon which they can be reconciled." *Id.*

Here, the findings alleged to conflict involve the validity of signatures on two entirely separate deeds, the April 4 deed and the April 18 deed. Morris does not explain, and the record does not show, how the findings at issue are about the same material fact. *See id.*

The evidence before the trial court included not only the testimony described above, but also copies of the two deeds at issue and other documents containing signatures of Morris that she did not dispute were genuine. The record shows the trial judge examined those documents and stated on the record that the signature on the April 4 deed appeared to her to be genuine and the signature on the April 18 deed appeared to her to have been forged. Further, T. Bailey testified Morris signed the April 4 deed in her presence at Morris's home. However, Brown testified he did not recall ever seeing Morris and could have accepted false identification.

The record shows at least one reasonable basis upon which the findings at issue can be reconciled. *See id.* The trial judge could have disregarded the expert evidence entirely and based her findings on her own examination of the two disputed signatures and the testimony of the notaries. *See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex.1986) ("the judgments and inferences of experts or skilled witnesses, even when uncontroverted, are not conclusive on the jury or trier of fact, unless the subject is one for experts or skilled witnesses alone" and trier of fact "may accept lay testimony over that of experts"); *see also In re Price*, No. 04–05–00438–CV, 2006 WL 3725542, at *2 (Tex. App.-San Antonio Dec. 20, 2006, pet. denied) ("expert testimony is not required to prove the validity of a signature"). Accordingly, because the totality of the evidence as to the two deeds at issue is not identical, the different findings as to the two deeds are not necessarily conflicting or inconsistent. *See Bender*, 600 S.W.2d at 263 (concluding that because findings at issue could be harmonized under the evidence, there was no irreconcilable conflict).

Further, while Morris contends the "overwhelming weight" of the evidence identified by her and described above "clearly establishes that the signature on the April 4 deed is a forgery," she does not explain, and the record does not show, "how the contrary evidence greatly outweighs the evidence supporting the verdict." *Maritime Overseas Corp.*, 971 S.W.2d at 407. Morris asserts the "scant evidence proffered by Wells Fargo in support of its argument" consisted of the testimony of T. Bailey and the testimony of the expert, and such evidence "does not even approach the amount of evidence presented that [the signatures at issue] were forgeries." However, Morris does not mention, or address the weight of, the copies of the April 4 deed and the known signatures of Morris that were admitted into evidence and reviewed by the fact finder.

We recognize, the trial judge, as fact finder, was the sole judge of the credibility of the witnesses and the weight to be given their testimony. *See Leyva*, 358 S.W.2d at 549. In the final analysis, this Court may not pass upon the witnesses' credibility or substitute its judgment for that of the trier of fact, even if the evidence would clearly support a different result. *Maritime Overseas Corp.*, 971 S.W.2d at 407; *see also Dubree v. Blackwell*, 67 S.W.3d 286, 289 (Tex.App.-Amarillo 2001, no pet.) (stating appellate court should not reweigh evidence and set verdict aside merely because it feels different result is more reasonable, and concluding evidence was not factually insufficient in case where elderly woman deeded her home and bank account to acquaintance). On the record before us, we cannot conclude the evidence was factually insufficient to support the trial court's finding that Morris's signature on the April 4 deed was "genuine." We decide Morris's first issue against her.

### 2. Fraud by T. Bailey

■ With respect to her second issue, Morris contends "the overwhelming weight

of the evidence supports the claim that ... [T. Bailey], the notary of the April 4 deed, perpetrated a fraud on Morris in concert with [C. Bailey] in order to obtain an authentic signature on the [April 4 deed]." Morris asserts

> The trial court even openly stated that it believed Ms. Bailey slipped the April 4 deed into other papers in order to apparently fool Morris into signing it. Thus, a fraud was perpetrated upon Morris by the notary that overcomes the validity of a certificate of acknowledgment and the April 4 deed was void.

Wells Fargo responds "[Morris's] assertion that the April 4 deed is void because of the fraud perpetrated by the notaries [sic] is not an accurate statement of the law." Rather, Wells Fargo asserts, "[d]eeds obtained by fraud are voidable rather than void." Wells Fargo argues "the trial court properly found that [Wells Fargo] was a bona fide lender and therefore its foreclosure vested title to the property in [Wells Fargo]."

Assuming without deciding the alleged fraud by T. Bailey was properly proved, we still cannot agree with Morris's position. Morris cites no authority, and we have found none, supporting her assertion that where clear and unmistakable proof of fraud by a notary overcomes the validity of a certificate of acknowledgment on a deed, such deed is thereby "void." *Cf. Ford*, 235 S.W.3d at 618 (deeds obtained by fraud are voidable rather than void); *Fillmore v. Pac. Mountain, L.L.C.*, No. 05–02–01236–CV, 2003 WL 1545933, at *2 (Tex.App.-Dallas March 26, 2003, no pet.) (concluding notary's improper acknowledgment did not render deed void); *Dyson Descendant Corp. v. Sonat Exploration Co.*, 861 S.W.2d 942, 948 (Tex.App.-Houston [1st

Dist.] 1993, no writ) (where improper certificate of notary is regular on its face, instrument is valid as to subsequent purchasers without notice of defect). Accordingly, we decide against Morris on her second issue.[2]

### III. CONCLUSION

On this record, we conclude (1) the evidence was legally and factually sufficient to support the trial court's finding that Morris's signature on the April 4 deed was "genuine" and (2) the April 4 deed was not "void" as a result of the alleged fraud of T. Bailey. Morris's two issues are decided against her. The trial court's judgment is affirmed.

---

**2.** Morris does not otherwise challenge the trial court's conclusions respecting the vesting of title in Wells Fargo as a "bona fide lender."