**Affirm and Opinion Filed April 12, 2022**



In The

## Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-19-01466-CV

**ABRAHAM MAAYEH, Appellant**

**V.**

**MARCUS BRIAN CURRY, INDIVIDUALLY AND AS TRUSTEE OF THE
1106 WALLBROOK DRIVE LAND TRUST; AND ELISEO SANCHEZ,
INDIVIDUALLY (IN REM ONLY), Appellees**

**On Appeal from the 162nd Judicial District Court
Dallas County, Texas
Trial Court Cause No. DC-17-13602**

## MEMORANDUM OPINION

Before Justices Osborne, Pedersen, III, and Reichek
Opinion by Justice Osborne

This is a dispute about title to real property. A jury answered "no" to the

question whether appellant Abraham Maayeh's title to real property was superior to

appellee Eliseo Sanchez's, and the trial court rendered judgment for Sanchez in

accordance with the jury's verdict. In one issue, Maayeh challenges the legal and

factual sufficiency of the evidence to support the jury's finding. We affirm the trial

court's judgment.

## BACKGROUND

Maayeh and Sanchez both claim title to real property on Wallbrook Drive in Dallas (the "Property").

There is no dispute that Maayeh purchased the Property in 2003, signed a deed of trust in September 2003 to secure a $117,500.00 debt on the Property, and later fell behind in his payments to Ocwen Loan Servicing, LLC ("Ocwen"), a subsequent lender. Nor is there any dispute that in 2013, Maayeh entered into discussions with Marcus Curry[1] about selling the Property in order to "get out clean from the house and preserve my credit and put the situation behind me." But Maayeh contends he never conveyed the Property to Curry.

The Dallas County deed records include a deed conveying the Property from Maayeh to the "11046 Wallbrook Drive Land Trust, Marcus Curry, Trustee" (the "Trust") on September 30, 2013, and a subsequent deed conveying the Property from the Trust to Sanchez on November 18, 2013. There is no dispute that Sanchez and his family moved into the home on the Property on December 3, 2013, and have lived there ever since. Sanchez offered evidence at trial that he has paid $42,000 in property taxes, $119,000 in mortgage payments, $12,000 in insurance, and $80,000 in repairs on the Property.

---

[1] Although originally a defendant in his individual capacity and as trustee, Curry is not a party to this appeal. Maayeh's operative petition alleges that a default judgment was rendered against Curry prior to trial.

Maayeh, however, contends that he never sold the Property to Curry or the Trust, so the Trust could not convey the Property to Sanchez. He filed this suit alleging that his signature and the notarization on the September 30, 2013, recorded deed (the "Recorded Deed") are forgeries.

There is a second, unrecorded deed Maayeh admits signing before a different notary (the "Unrecorded Deed"). Like the Recorded Deed, the Unrecorded Deed is dated September 30, 2013, and provides that Maayeh conveys the Property to the Trust. But Maayeh contends that he never delivered the Unrecorded Deed to Curry because he never received documentation from Ocwen, Curry, or the Trust that his obligation under the deed of trust had been paid or transferred.

Maayeh filed suit in 2017, and the case proceeded to a jury trial on Maayeh's claim that he held superior title to the Property. After hearing testimony from Maayeh, Sanchez, and several other witnesses, the jury was instructed:

QUESTION NO. 1

Do you find by a preponderance of the evidence that ABRAHAM MAA[YEH] holds superior title to the Property to that held by ELISEO SANCHEZ[?]

You are instructed that ABRAHAM MAA[YEH] holds superior title to the Property unless he conveyed the property to MARCUS CURRY.

You are further instructed that a conveyance of an interest in real property must be in writing, signed by the grantor, and delivered to the grantee.

You are further instructed that a forged deed does not convey title and that to "forge" means to alter, make, complete, execute, or authenticate

–3–

any writing so that it purports to be the act of another who did not authorize it.

You are instructed that "delivery" of a written instrument is a parting with the possession or custody thereof with the intention that the same become immediately operative.

You are instructed that "delivery" of a deed that is lost may be proved by circumstantial evidence.

**ANSWER:** "Yes" or "No." _____No_____

The trial court rendered judgment for Sanchez based on the jury's answer. This appeal followed.

## ISSUE AND STANDARD OF REVIEW

In a single issue, Maayeh contends the evidence was legally and factually insufficient to support the jury's implied finding that he conveyed the Property to Curry.[2]

A legal sufficiency or "no evidence" challenge will only be sustained on appeal if the record demonstrates: (1) the complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital

---

[2] Sanchez contends "Maayeh has waived review on appeal by failing to raise, brief and argue against the Judgment in favor of Sanchez on Sanchez's claim to quiet title, removal of cloud on title and expungement of lis pendens that would support the judgment." Although a quiet-title suit is an equitable remedy and a trespass to try title suit is a legal remedy afforded by statute, both are actions to recover possession of land unlawfully withheld. *Lance v. Robinson*, 543 S.W.3d 723, 738–39 (Tex. 2018). The jury's finding, the trial court's judgment, and Maayeh's appellate issue all address the parties' competing claims to title of the Property. Consequently, we conclude that Maayeh has not waived appellate review. *See Perry v. Cohen*, 272 S.W.3d 585, 587 (Tex. 2008) (instructing that "[a]ppellate briefs are to be construed reasonably, yet liberally, so that the right to appellate review is not lost by waiver," and "appellate courts should reach the merits of an appeal whenever reasonably possible").

–4–

fact is no more than a scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *BNSF Ry. Co. v. Phillips*, 485 S.W.3d 908, 910 (Tex. 2015) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005)). When conducting a legal sufficiency review, we consider the evidence in the light most favorable to the verdict, crediting favorable evidence if a reasonable juror could, and disregarding contrary evidence unless a reasonable juror could not. *City of Keller*, 168 S.W.3d at 822, 827. The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *Id.*

"When a party attacks the factual sufficiency of an adverse finding on an issue on which she has the burden of proof,[3] she must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). We must "consider and weigh all of the evidence, and can set aside a verdict only if the evidence is so weak

---

[3] Our standard of review depends upon the burden of proof at trial. Maayeh argues that because he established a prima facie case of title from a common source, the burden shifted to Sanchez to show superior title. *See Davis v. Gale*, 330 S.W.2d 610, 612 (Tex. 1960) ("Where the plaintiff has shown title under [an] agreed common source, the burden of proof shifts to the defendant to show a superior title under the common source . . . ."). This burden-shifting principle, however, is based on the premise that a plaintiff otherwise would be required "to prove the negative"; that is, to prove the defendant did not obtain the title from the common source, and "the plaintiff could not reasonably be required to show what the defendant's title was." *Simmons Hardware Co. v. Davis*, 27 S.W. 62, 63 (Tex. 1894) (cited in *Davis v. Gale*, 330 S.W.2d at 612). Here, however, the question submitted to the jury was whether Maayeh "holds superior title" to Sanchez's title, and the jury was instructed that Maayeh "holds superior title . . . unless he conveyed the property to [Curry]." This question—not objected to by Maayeh—turns entirely upon evidence of Maayeh's actions and intent, not Curry's or Sanchez's. Consequently, we conclude that *Davis*'s burden-shifting analysis does not apply, and Maayeh, as plaintiff, bore the burden to prove his superior title.

or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Id.*

Under both a legal and factual sufficiency review, we are mindful that the jury, as fact finder, was the sole judge of the credibility of the witnesses and the weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819. We may not substitute our judgment for the fact finder's, even if we would reach a different answer on the evidence. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

**APPLICABLE LAW**

### 1. Conveyance of title

A conveyance of an interest in real property must be in writing, signed by the grantor, and delivered to the grantee. *See* TEX. PROP. CODE § 5.021. A deed does not have to be recorded to convey title. *Thornton v. Rains,* 299 S.W.2d 287, 288 (Tex. 1957); *Adams v. First Nat'l Bank of Bells/Savoy*, 154 S.W.3d 859, 869 (Tex. App.—Dallas 2005, no pet.). A conveyance is effective and title is transferred when the following has occurred: (1) execution of the deed, and (2) delivery of the deed. *Stephens County Museum, Inc. v. Swenson,* 517 S.W.2d 257, 261 (Tex. 1974); *Adams*, 154 S.W.3d at 869.

Two elements must be established to prove delivery of a deed: (1) the deed must be delivered into the control of the grantee, and (2) the grantor must intend the deed to become operative as a conveyance. *Binford v. Snyder,* 189 S.W.2d 471, 475

(Tex. 1945); *Hicks v. Loveless,* 714 S.W.2d 30, 32 (Tex. App.—Dallas 1986, writ ref'd n.r.e.).

The question whether a deed has been delivered is primarily one of the grantor's intent. *Adams*, 154 S.W.3d at 869. Without the required grantor's intent, the manual delivery of the deed to the grantee does not pass title. *Id.* The intent of the grantor is determined by examining all the facts and circumstances preceding, attending, and following the execution of the deed. *Id.* If delivery is completed with the required intention, a subsequent change of intention will not affect the transaction. *Id*. at 869–70. Also, a secret or undisclosed intention of the grantor not to divest himself of title will not prevent a duly executed and delivered deed from taking effect. *Id.* at 870.

"A prima facie case of delivery and the accompanying presumption that the grantor intended to convey the land according to the terms of the deed is established . . . when it is shown that the deed has been filed for record." *Stephens Cty. Museum, Inc.*, 517 S.W.2d at 261–62. A party may overcome the presumption that the requisite intent to convey the property accompanied the delivery "by showing (1) that the deed was delivered or recorded for a different purpose, (2) that fraud, accident, or mistake accompanied the delivery or recording, or (3) that the grantor had no intention of divesting himself of title." *Id.* at 262.

What constitutes a delivery is a question of law. *Ragland v. Kelner,* 221 S.W.2d 357, 359 (Tex. 1949); *see also Adams*, 154 S.W.3d at 870. Whether there

has been a delivery of a deed is a fact question. *Ragland,* 221 S.W.2d at 359; *Adams,* 154 S.W.3d at 870.

## 2. Forgery

A forged deed is void. *Morris v. Wells Fargo Bank, N.A.*, 334 S.W.3d 838, 843 (Tex. App.—Dallas 2011, no pet.). "[A] certificate of acknowledgement is prima facie evidence that [the signatory] appeared before the notary and executed the deed in question for the purposes and consideration therein expressed." *Bell v. Sharif-Munir-Davidson Dev. Corp.*, 738 S.W.2d 326, 330 (Tex. App.—Dallas 1987, writ denied). Clear and unmistakable proof that either the grantor did not appear before the notary or that the notary practiced some fraud or imposition upon the grantor is necessary to overcome the validity of a certificate of acknowledgment. *Id.*

### DISCUSSION

Maayeh argues that because there was no valid conveyance of the Property to Curry, Curry could not convey title to Sanchez. He argues the Recorded Deed did not convey title because it was a forgery, and the Unrecorded Deed did not convey title because he never delivered it to Curry. Sanchez responds that there was evidence to support a finding that the Recorded Deed was not forged, or in the alternative, that Maayeh delivered the Unrecorded Deed to Curry with the intent to convey the Property.

Both parties rely on Maayeh's email communications with Curry before and after September 30, 2013, as evidence of Maayeh's intent. In addition to telling

Curry his "main goal" was "to get out clean from the house and preserve my credit," Maayeh referred to the proposed transaction as a "sale," discussed arrangements to review, sign, and notarize the necessary documents, and agreed to a September 30 closing date. Curry forwarded documents including a "Standard Real Estate Purchase and Sale Agreement" to Maayeh for review. After receiving the documents and discussing and rejecting the possibility of a "short sale," Maayeh emailed Curry, "Let's continue with the sale. I want to put this behind me."

Among the documents Maayeh admitted signing and returning to Curry were the purchase and sale agreement and a "Mortgage Disclosure Statement." Both of these documents refer to Maayeh as "Seller." Sanchez argues that both of these documents clearly reflect Maayeh's intent to sell the Property to Curry.

In the first sentence of the purchase and sale agreement, the parties "hereby agree that Seller"—identified as Maayeh—"will sell and Buyer will buy" the Property. The agreement also provides that "the Property will be conveyed by General Warranty Deed," and the Buyer's "purchase money note" will be due "upon resell [sic] of the property by Buyer to a cash buyer or individual that obtains new third party financing to purchase the property," not upon closing. Maayeh signed the document as "Seller," with a "Date of Acceptance" of September 24, 2013.

The mortgage disclosure statement informed Maayeh as "Seller" that "the purchaser is not assuming the loan(s) and that the seller will remain liable on the existing loan(s)," and "those loan(s) may continue to show on seller's credit report

until such time that a new buyer obtains new financing." The statement also provided, "Seller understands they [sic] no longer have any owner interest in the property and understand the purchaser is taking the property subject to the underlying loan(s) on a non-recourse basis." Maayeh signed the document as "Seller/Grantor" on September 30, 2013.

Although the purchase and sale agreement and the mortgage disclosure statement are not conveyances, they provide context for the entire transaction and evidence that Maayeh intended to sell the Property on September 30, 2013, understanding that his indebtedness to Ocwen would not be paid until Curry found a new buyer. *See Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000) (recognizing "well-established law that instruments pertaining to the same transaction may be read together to ascertain the parties' intent"). With this background, we review the evidence offered regarding each deed.

## 1. The Unrecorded Deed

At trial, Maayeh testified that he and Curry went together to Chase Bank in Tarrant County on September 30, 2013, to sign the documents required for the transaction before a notary. He signed several documents including the Unrecorded Deed before notary Brad Holmes. Maayeh testified that he gave the originals of all of the documents *except* the Unrecorded Deed to Curry. He explained that he intended to keep the Unrecorded Deed in his possession, telling Curry, "I'm going to keep the papers with me until you pay off the loan. . . . I kept the deed with me."

He conceded, however, that he did not have the original of the Unrecorded Deed and does not know what happened to it, other than explaining that his business "moved a couple of times so we lost lots of paperwork and files." Only a copy of the Unrecorded Deed was admitted into evidence.

On cross-examination, the jury heard portions of Maayeh's deposition testimony that were inconsistent with his testimony at trial. At his deposition, Maayeh testified that he sold the Property to Curry on September 30, 2013. And when asked what he and Curry discussed on that day, Maayeh responded, "Nothing. [Curry] just brought the papers, and he told me to sign them then to notarize them so we went to Chase Bank" and then returned to Maayeh's office.

On October 4, 2013, Maayeh emailed Curry to report that "I received a call from Ocwen and I told them that I sold the property to you." It was not until several days later that Maayeh expressed any confusion about the transaction, emailing Curry to ask why Ocwen continued to show him as the debtor on the loan. Curry explained that "[t]he loan is not being paid off now with Ocwen, but we are taking it over." He wrote Maayeh that until the property was sold, "the loan will be attached to your name, but we are responsible for the payments." Maayeh responded:

> It is a misunderstanding and I was a little confused. I read in the document where it says you are taking over until the house is sold and I still thought that you were going to payoff [sic] the loan and then sell the house. This would not have made a difference or made me change my mind anyway and it does not matter to me since I had to have a fast solution and my main objective was to be out of this responsibility.

Maayeh continued to correspond with Curry by email until March 3, 2016, when Maayeh's message—"I thought you already sold the house to someone as the tax record shows the name SANCHEZ ELISEO as 100% owner"—was returned as undeliverable. All of the emails discuss Maayeh's concerns about damage to his credit because of late payments to Ocwen. Although Maayeh expressed confusion about whether Curry had sold the Property or only rented it, Maayeh never said he had retained the original deed or that he did not intend to convey the Property to Curry or the Trust until his name had been removed from the Ocwen loan.

Maayeh later communicated with Sanchez and his attorneys about payment of the loan and learned that "[t]itle is already vested in [Sanchez's] name from when he purchased the property from Marcus Curry." Maayeh did not then claim that he still owned the Property, that he had retained the original of the Unrecorded Deed, or that he never intended to convey the Property to Curry or the Trust in 2013. As in his communications with Curry, his expressed concerns were his removal from the Ocwen loan obligation and that Sanchez was making timely payments.

Maayeh correctly argues that there is no presumption of delivery or intent to convey the Property under the Unrecorded Deed. *Cf. Stephens Cty. Museum, Inc.*, 517 S.W.2d at 261–62 (presumption of intent to convey arises with prima facie case of delivery and proof that deed has been filed for record). He argues he established that "he was not going to deliver the deed" until his sole purpose—paying off his mortgage indebtedness—was accomplished. He argues there is no direct or

–12–

circumstantial evidence of delivery. And he contends an inference that he lost the Unrecorded Deed is "more plausible" than an inference that he delivered the Unrecorded Deed to Curry. He argues there is no evidence Curry ever had possession of the Unrecorded Deed, concluding, "[t]he very fact that [Curry] filed a forged deed with the deed records makes that the more likely inference."

Sanchez responds that there is sufficient evidence to support a finding that Maayeh delivered the Unrecorded Deed with intent to convey the Property. He argues that the jury was not limited to considering only Maayeh's testimony about his intent, but could consider other evidence of what Maayeh said, did, or was told. *See Stephens Cty. Museum, Inc.*, 517 S.W.2d at 262 (grantor's intent to deliver deed "is determined by examining all the facts and circumstances preceding, attending and following the execution of the instrument").

The jury was the sole judge of Maayeh's credibility. *See City of Keller*, 168 S.W.3d at 819. In judging Maayeh's credibility, Sanchez argues, the jury could consider evidence that Maayeh had a "significant financial interest" in claiming superior title to Sanchez's including that (1) Sanchez had paid down the debt to Ocwen; (2) Sanchez had made significant repairs and improvements to the Property; and (3) the value of the Property had increased over 60% between September 2013 and the time of trial. Sanchez argues that the Unrecorded Deed conveyed title to the Property even though it was not recorded, and Maayeh's intent at the time he executed and delivered the deed is controlling, even if he changed his mind later.

–13–

*See Adams*, 154 S.W.3d at 869–70 (if delivery is completed with the required intention, a subsequent change of intention will not affect the transaction).

We conclude there was sufficient evidence from which the jury could find that Maayeh delivered the Unrecorded Deed to Curry intending it to become operative as a conveyance. *See Binford*, 189 S.W.2d at 475; *Hicks*, 714 S.W.2d at 32. Maayeh never mentioned retaining the original deed in any of his emails with Curry about payment of the loan, nor did he contend he still owned the Property in his subsequent communications with Sanchez and his representatives. The jury heard Maayeh's deposition testimony that he and Curry discussed "[n]othing" when they met other than having the documents signed and notarized. Although Maayeh testified at trial to the contrary—that he told Curry at their only in-person meeting he was retaining the original deed "until you pay off the loan"—the jury was the sole judge of the credibility of this evidence. *See City of Keller*, 168 S.W.3d at 819.

Further, even if Maayeh had a "secret or undisclosed intention . . . not to divest himself of title," that unexpressed intention did not "prevent a duly executed and delivered deed from taking effect." *See Adams*, 154 S.W.3d at 870. Maayeh's original delivery of the Unrecorded Deed "with the required intention" was sufficient to convey the Property even if he later changed his mind. *See id.* at 869–70.

–14–

## 2. The Recorded Deed

Maayeh testified at trial that he did not become aware of the allegedly forged deed until 2017, when he filed suit. Maayeh testified that he did not sign the Recorded Deed and that his purported signature on it was forged. He also contends that he presented clear and unmistakable proof that he did not appear before Elizabeth Almond, the notary who acknowledged the Recorded Deed. He argues that any presumption that arose from recording the Recorded Deed "is destroyed by the clear evidence of forgery" as well as the "undisputed evidence" he had no intent to convey title without payment of the mortgage.

To support his contention that the Recorded Deed was a forgery, Maayeh offered Almond's testimony (by deposition) that the notarization does not appear in her record book, and she would not have notarized a document without recording it in her book. She explained she would not have notarized a document unless the person whose signature she was to notarize appeared before her in person with appropriate identification. She testified that she always recorded notarizations in her book and could not explain why she had no record of notarizing the Recorded Deed. She also testified that her signature on the Recorded Deed has a "little hook" above the capital "E" in her first name, and she "do[es]n't usually do that."

Sanchez, in turn, cites Almond's testimony that the notary stamp on the Recorded Deed looked like hers. Almond explained that the stamp was kept in a locked drawer in her office. She testified that when her office door closed, it

automatically locked. She kept the keys to the drawer and to her office door on a wristband keychain. She testified that other than the "little hook," the signature appeared to be hers, and her printed name below her signature was in her usual handwriting. By the time of her deposition, Almond had no independent memory of Maayeh, the Recorded Deed, or the notarization. Sanchez also argues that the record included documents bearing signatures that Maayeh and Almond testified were genuine, allowing the jury the opportunity to compare those documents with the alleged forgeries. *See Morris*, 334 S.W.3d at 848 (trial judge acting as trier of fact could have disregarded expert evidence regarding alleged forgery "and based her findings on her own examination of the two disputed signatures and the testimony of the notaries").

Sanchez also responds that a grantor may adopt even a forged deed by subsequent acknowledgement, and that Maayeh failed to offer the "clear and unmistakable" proof required to overcome the presumption that a duly acknowledged instrument is valid. *See Bell*, 738 S.W.3d at 330.

We conclude there was legally and factually sufficient evidence from which the jury could find that the Recorded Deed was effective to convey the Property because it was not forged. The evidence was conflicting, and the jury was the sole judge of its credibility. *See City of Keller*, 168 S.W.3d at 819. The jury was instructed that "a forged deed does not convey title," and we presume the jury followed this instruction in considering the conflicting evidence and reaching its answer to

Question 1 of the jury charge. *See Credit Suisse, AG v. Claymore Holdings, LLC*, 610 S.W.3d 808, 827 (Tex. 2020) (appellate court "must assume that the jury followed the trial court's instructions and answered the question put to them" [internal quotation omitted]).

Considering the evidence in the light most favorable to the jury's verdict, we conclude that "reasonable and fair-minded people" could find that Maayeh did not "hold[ ] superior title to the Property to that held by [Sanchez]." *See City of Keller*, 168 S.W.3d at 827. And after examining all of the evidence, we conclude that the jury's finding is not so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *See Dow Chem. Co.*, 46 S.W.3d at 242. Consequently, we conclude the evidence was legally and factually sufficient to support the jury's verdict, and we decide Maayeh's sole issue against him.

## CONCLUSION

We affirm the trial court's judgment.

/Leslie Osborne//

191466f.p05

LESLIE OSBORNE
JUSTICE

–17–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ABRAHAM MAAYEH, Appellant

No. 05-19-01466-CV     V.

MARCUS BRIAN CURRY,
INDIVIDUALLY AND AS
TRUSTEE OF THE 1106
WALLBROOK DRIVE LAND
TRUST; AND ELISEO SANCHEZ,
INDIVIDUALLY (IN REM ONLY),
Appellees

On Appeal from the 162nd Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-17-13602.
Opinion delivered by Justice
Osborne. Justices Pedersen, III and
Reichek participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee Eliseo Sanchez, Individually (in rem only) recover his costs of this appeal from appellant Abraham Maayeh.

Judgment entered this 12th day of April, 2022.