In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-22-00334-CV

KEVIN PATTON AND WILLEM A. COETZEE, Appellants

V.

JAMIE ECHOLS, BENT EQIUPMENT, INC.,
AND CHASE ECHOLS, Appellees

On Appeal from the 457th District Court
Montgomery County, Texas
Trial Cause No. 21-09-13309-CV

## MEMORANDUM OPINION

This lawsuit concerns a dispute between adjoining landowners in the platted Security Subdivision, located in Montgomery County, Texas. Below is a graphic that shows the parties' lots, which is excerpted from the original plat for the Security Subdivision, originally recorded in 1913 at Volume 1, pages 21 and 22 of the Map

Records of Montgomery County.[1] The plat was an exhibit at trial and the parties agree that the exhibit accurately depicts the parties' lots and what the parties call "Twin Oaks Road."



Road labeled "California Avenue" on Plat;
Now known as "Twin Oaks Road"

Appellant Kevin Patton's property consists of Lots 21, 22, 31, and 32, and his lots are shaded pink in the graphic. Appellant Willem Coetzee's property consists of Lots 48, 57, and 74, and his property is shaded blue in the graphic. Appellees Chase and Jamie Echols' property consists of Lots 47 and part of lot 58, and the Echols'

---

[1] The parties agree that the Plat is recorded in Volume 1, Page 21 of the Map Records of Montgomery County, Texas. An exhibit in the record indicates it was also recorded in Volume 27, Page 509 of the Deed Records of Montgomery County, Texas. The parties do not dispute the recordation of the plat.

property is shaded yellow in the graphic. Twin Oaks Road[2] runs north and south to the west of Patton's and Coetzee's properties, and on the originally recorded plat, it is labeled as California Avenue. The curved bolded line running from approximately northwest to southeast is Lawrence Creek. Maps admitted into evidence at the bench trial depict State Highway 105 as running east-west and south of the properties involved in this lawsuit, eventually intersecting with and then running perpendicular to Twin Oaks Road.

Pretrial Procedure

Patton's Original Application

This lawsuit began in September of 2021 when Kevin Patton ("Plaintiff" or "Patton") filed an Application and Affidavit for Temporary Restraining Order, Temporary Injunction, Permanent Injunction, and Declaratory Judgment ("Application"). The Application named Jamie and Chase Echols (collectively "Echols"), Bent Equipment, Inc. ("Bent Equipment"),[3] and Willem Coetzee ("Coetzee") as defendants. Therein, Patton alleged that he sought an injunction to keep Echols and Bent Equipment from using "his private easement" for ingress and

---

[2] The parties also refer to Twin Oaks Road as Twin Oaks Drive and Twin Oaks Boulevard during the lawsuit. Patton, Coetzee, and Jamie and Chase Echols give their address as Twin Oaks Road.

[3] Jamie Echols testified at the bench trial that she was the president of Bent Equipment, Inc., and Chase Echols testified that the business repaired heavy equipment and began operating in 2016 and shut down about six weeks before the bench trial.

egress and to require Coetzee and Echols to "remove the dam constructed on the property of [] Coetzee which obstructs the natural flow of water away from Plaintiff's property and is causing Plaintiff's property to flood." Plaintiff alleged that he had an "exclusive, private Easement" located about one-quarter of a mile north of Highway 105.

According to the Application, in October of 2017, Echols constructed "an approximately 600 foot long raised road" from their property across Coetzee's property and to Patton's alleged easement, and the road effectively operates as a dam that blocks natural drainage of surface water away from Patton's property. The Application further alleges that the Echols' use of Patton's private easement was causing the easement to deteriorate, and some traffic across Patton's easement resulted in the gate not being closed and livestock escaping.

Patton asserted that the parties who created his easement intended it to be exclusive to the owner of Lots 22 and 31, and Patton alleged that the Echols' property abuts a public road and that they have used that road and could use it again. Patton sought a declaratory judgment declaring that: Patton's easement is private, not public; Patton's easement is exclusive to Patton or the owners of Lots 22 and 31; and that the Echols' use of Patton's easement unreasonably interferes with Patton's use and enjoyment of his property. Patton sought injunctive relief and brought a

4

claim under the Texas Water Code for diversion of the natural flow of surface waters, and Patton sought an injunction against Echols to remove or flatten the road.

Patton attached exhibits to the Application, including copies of certain deeds from Patton's chain of title, an affidavit of Willem A. Coetzee,[4] and photos of heavy equipment purportedly using Patton's easement. In his Affidavit, Coetzee states he owns Lots 48, 57, and 74 in the Security Subdivision, Section Two, Montgomery County, Texas, and that, when he bought his property, he understood that Freddie Echols—the grantor from whom Patton acquired his lots—had a 30-foot "exclusive private easement" along the west side of Coetzee's property from Twin Oaks Road to Freddie Echols' property. Coetzee further stated in his Affidavit that he told Chase Echols that Coetzee did not have the authority to grant Chase the use of Patton's easement.

On September 29, 2021, the trial court signed an ex parte Temporary Restraining Order to be in effect until October 13, 2021, when a Temporary Injunction hearing was set. In the TRO, the trial court found that Patton had a road easement over a 30-foot strip of land from the southeast corner of his Lot 31, running south along the western boundary of Lot 48 and ordered Echols, Bent Equipment, or their families, agents, or invitees not to use the easement.

---

[4] Willem Coetzee subsequently obtained separate counsel.

5

<u>Echols' and Bent Equipment's Motion to Dissolve TRO</u>

Echols and Bent Equipment filed a Motion to Dissolve Temporary Restraining Order. The Motion asserted that what Patton claimed as an exclusive, private easement is actually a road located to the west of Lot 48's western boundary, and that this road is reflected in the recorded plat for the Security Subdivision. The Motion also alleged that the Montgomery County Commissioner's Court had noted that the roadways in the Security Subdivision had been dedicated, as reflected in a 1990 Order abandoning a portion of the plat.[5] Echols and Bent Equipment asked the trial court to dissolve the TRO.

At the hearing on the motion, counsel for Echols and Bent Equipment told the trial court that "the roads are on the recorded plat[]" for the Security Subdivision, even though many roads had not been built, and the plat shows that the lots do not have common corners "because this road is in between them." In addition, counsel for Echols and Bent Equipment explained that, in 1990, the Commissioner's Court "cancelled" a portion of the subdivision which had been dedicated to be used as a landfill, and in its order partially abandoning the subdivision, the Commissioner's Court also acknowledged that all other lots and roadways in the Security Subdivision

---

[5] The 1990 Order in which the Montgomery County Commissioner's Court abandoned part of the Security Subdivision did not include the lots involved in this lawsuit. The Motion asserts that the developers wished to use the lots to be abandoned as a landfill.

had been dedicated. Echols and Bent Equipment argued that because the roads in the subdivision had been dedicated for public use, Patton could not adversely possess that land. Patton argued that Echols had used Lawrence Creek Road to access Echols' property, it was not clear why they stopped doing so, and that Echols could also use Hayes Road[6] to access Echols' property.

The trial court signed an Order Granting Motion to Dissolve Temporary Restraining Order, which also ordered the users of the road to close the gate at issue when not driving on the road.

Answer, Counter-Claim, and Cross-Claim

Echols and Bent Equipment filed an Original Answer, Original Counter-Claim, and Original Cross-Claim. In their Answer, Echols and Bent Equipment asserted a general denial and several specific denials including: Patton's alleged easement is neither exclusive nor private but it is located on a road shown in the subdivision plat; Echols and Bent Equipment deny diverting the natural flow of surface water; and they assert that Patton lacks standing to seek relief related to an alleged weight-restricted bridge because the bridge was built by and is maintained by the County.

---

[6] Maps admitted at the bench trial show "Hales Road" to the east of the parties' lots.

7

Echols and Bent Equipment asserted claims against Patton and Coetzee for injunctive relief, declaratory judgment, breach of contract, quasi contract, wrongful injunction, and obstruction of a passageway. According to Echols and Bent Equipment, Coetzee asserted that he owns the road to the west of his lots and that "he somehow owns this road and that Chase [] and Jamie Echols may not use it[,]" even though the roads or easements surrounding Coetzee's lots were shown on the original subdivision plat. Echols and Bent Equipment asserted that Patton has put a gate in the road to the north of Coetzee's Lot 48 and denied them use of the road. Echols and Bent Equipment also alleged that the neighbors to the south of their property blocked their access, and when Chase approached Coetzee, "Coetzee assured Chase [] and Jamie Echols that he would grant them an easement to cross the Coetzee Tract." In reliance on this agreement, Echols paid for a survey, spent more than $32,000 in materials to build a road across the Coetzee Tract, and also built a 330-linear-foot fence and culvert. According to Echols and Bent Equipment, Coetzee then reneged on the deal, and he barricaded the road and cut off their access.

Echols and Bent Equipment asserted a claim for breach of contract and quasi-contract against Coetzee for reneging on the alleged agreement giving Echols an express, permanent easement across the Coetzee Tract and asserting that Echols' part performance takes the agreement out of the statute of frauds. Echols and Bent Equipment asserted a wrongful injunction claim against Patton for being "less than

8

candid" with the trial court by failing to inform the court about the recorded plat for the subdivision. Echols and Bent Equipment also asserted a claim for obstruction of a passageway, alleging that Patton's actions in installing a gate to block the road north and east of Coetzee's Lot 48 violated section 42.03 of the Texas Penal Code.[7] In their claim for declaratory judgment, Echols and Bent Equipment asked the trial court to declare that: the roads and easements shown on the recorded plat are for use by the public, including use by Echols; that Patton's claimed exclusive private easement does not exist but rather there is a non-exclusive easement for use by the public; the roads and easements shown on the subdivision plat have never been

---

[7] Section 42.03 of the Texas Penal Code, "Obstructing Highway or Other Passageway[,]" provides in relevant part:

(a) A person commits an offense if, without legal privilege or authority, he intentionally, knowingly, or recklessly:

(1) obstructs a highway, street, sidewalk, railway, waterway, elevator, aisle, hallway, entrance, or exit to which the public or a substantial group of the public has access, or any other place used for the passage of persons, vehicles, or conveyances, regardless of the means of creating the obstruction and whether the obstruction arises from his acts alone or from his acts and the acts of others; or

(2) disobeys a reasonable request or order to move issued by a person the actor knows to be or is informed is a peace officer, a fireman, or a person with authority to control the use of the premises:

(A) to prevent obstruction of a highway or any of those areas mentioned in Subdivision (1); or

(B) to maintain public safety by dispersing those gathered in dangerous proximity to a fire, riot, or other hazard.

(b) For purposes of this section, "obstruct" means to render impassable or to render passage unreasonably inconvenient or hazardous.

(c) An offense under this section is a Class B misdemeanor.

Tex. Penal Code Ann. § 42.03(a)-(c).

abandoned by the Montgomery County Commissioner's Court; and Patton has no right to install a gate across the roads or easements shown on the plat. Echols and Bent Equipment also sought attorney's fees. Echols and Bent Equipment later filed a First Amended Answer, First Amended Counter-Claim and First Amended Cross-Claim, which did not raise new claims and which was the live pleading at the time of trial.

After a hearing, the trial court signed an order for a temporary injunction ordering that Patton and Coetzee "shall not[] take any steps to prevent Counter Plaintiffs Jamie and Chase Echols, and Bent Equipment from using Twin Oaks (originally California), nor the road that connects Counter Plaintiffs' Lots to Twin Oaks."

Coetzee's Cross-Claim

Coetzee filed a cross-claim against Chase and Jamie Echols and Bent Equipment seeking declaratory judgment and asserting claims for intentional infliction of emotional distress and trespass. In his claim for declaratory judgment, Coetzee asked the trial court to declare that: he never conveyed an easement to Echols and Bent Equipment; he never gave Echols or Bent Equipment permission to use the Patton Easement; and he never gave Echols or Bent Equipment permission to cross his property for any commercial or business purpose.

10

Testimony of Freddie Echols

Freddie Echols ("Freddie") testified that he currently lives in Arkansas, but he used to own Lots 21, 22, 31, and 32, which he sold to Kevin Patton, and Chase Echols is Freddie's son. Freddie testified that he accessed his Lots by leaving Highway 105 and heading north on Twin Oaks Road, which "went right up to [the] gate" on the southwest corner of his property, and he stated "[t]here's a 30-foot easement." Freddie agreed that what the plat depicts as California Avenue is now known as Twin Oaks Road.

Freddie agreed that in 2007 he sold one acre of land in Lot 58 to his son Chase because Chase was buying the five acres that adjoined the one acre. Freddie recalled that when he lived in Texas, Chase and his family would access their property by going north on Lawrence Creek Road from Highway 105, and the road "went down to a low-water crossing and right up to Chase's [] house." Freddie testified that Andre Coetzee lived south of him on Lot 48 and he did not talk with Coetzee about an easement going across Lot 48.

On cross-examination, Freddie agreed that Twin Oaks Road dead-ended into his property and veered off to the left into the proposed Greenwood subdivision. Freddie further agreed that the deed under which he conveyed his property to Patton

---

[8] The bench trial occurred on June 27 and 28, 2022.

stated that the property was "part of the Town Site of Security" according to the recorded map.

Testimony of Phil Faraone

Phil Faraone testified that he works in the Montgomery County engineering office doing construction plan review, plat review, and maintaining the "road log" and right-of-way database. He also testified that he is the custodian of records relating to roads. When shown Patton Exhibit 16B, he stated that it "looks like the petition that went through for acceptance of Twin Oaks Road." Exhibits 16A and 16B were admitted into evidence, and Exhibit 16A includes a "Petition for Acceptance of Road into Montgomery County Road Maintenance System upon Finding of Prescriptive Right Based on Public Use" requesting acceptance of one mile of Twin Oaks Road, signed by the County Judge and Commissioners on April 13, 1992, and certified by the County Clerk. Faraone testified that Exhibit 16B was a record kept by his office that predated his employment and that he did not create. Looking at Defendants' Exhibit 102—a copy of the original plat for the Security Subdivision recorded in 1913—Faraone testified that the County accepted Twin Oaks Road as a road in 1992, and the County accepted and maintains 1378 feet of Twin Oaks Road north of Highway 105.

On cross-examination, Faraone agreed that where Twin Oaks Road extends south of Highway 105 it becomes California Avenue, and that the Security

12

Subdivision plat also depicts a street named "California[.]" Faraone identified Defendants' Exhibit 130 as a recorded replat of a lot in Section 2 of the Security Subdivision that was approved by the Commissioner's Court in 2021. He also agreed that, by approving the replat, his office acknowledged the roads shown on the original plat.

Testimony of Kevin Patton

Kevin Patton testified that he lives at 690 Twin Oaks Drive, and he owns Lots 21, 22, 31, and 32. Patton testified that no public road touches his property, and he accesses his property by a 30-foot wide easement from the end of Twin Oaks Road to his gate at the property line, which he stated is a distance of about 38 feet and the easement runs along the west line of Lot 48, which is owned by Coetzee. According to Patton, the town of Security was never formed and does not exist.

Patton agreed that Jamie and Chase Echols are his neighbors, and he can see the Echols' property from his home. According to Patton, before 2017, the Echols used Lawrence Creek Road to get to their property, and there were no other "avenues of exit" for the Echols before 2017. When asked what changed, Patton replied that, in 2017,

> [f]or some reason, they needed to come across Mr. Coetzee's property and out my property. I discovered this after I had been out of town three weeks and come in and approached the entrance leading in - - easement leading into my property, and the easement was completely cleared of all vegetation and a road was being built along the Coetzee property to

13

come down and cross my easement, all without my knowledge or permission.

According to Patton, at some point, he spoke with Chase Echols, who asked Patton if Chase's family could use Patton's easement for access because there had been a problem with another neighbor south of the Echols' property. Patton was not aware of any problems with Lawrence Creek Road,[9] and he testified that the neighbor to the south of Echols uses it daily.

Patton testified that he never granted or put anything in writing saying that Echols could use his easement. He also stated that he wanted the trial court to stop the access across his easement and to declare that the easement was exclusively his because "it is a deeded easement to me." According to Patton, the deed from Freddie Echols to Kevin Patton is silent as to any easements. However, Patton testified that the deed from the Baptist Foundation of Texas to the Veterans Land Board of the State of Texas, conveying Lots 22 and 31, includes a 30-foot strip of land in Lot 48 as an "easement and right-of-way," and it reserves to the grantor (Baptist Foundation) the right to use the right-of-way. Patton testified that the Veterans Land Board is Freddie Echols' predecessor in title.

---

[9] Maps admitted into evidence depict Lawrence Creek Road as a somewhat winding road running generally north and south to the east of Twin Oaks Road and also intersecting with State Highway 105.

<u>Testimony of Willem Andre Coetzee</u>

Willem Andre Coetzee testified that he lives at 674 Twin Oaks, he owns about fifteen acres, and he accesses his property from Twin Oaks Road. According to Coetzee, Twin Oaks Road runs to his property and ends at his driveway. He testified that Patton gets to his property by use of an easement over Coetzee's property and there is no public road that runs from his driveway to Patton's gate. Coetzee testified that there is an easement across his property that goes from where Twin Oaks Road ends to Patton's property and that Freddie Echols told him about the easement on the day Coetzee closed on his property. Coetzee further testified that Jamie and Chase Echols are his next-door neighbors, and since he moved in 2007, Jamie and Chase Echols had accessed their property through Lawrence Creek Road to the east of Coetzee's property. Coetzee agreed that the property description on his deed expressly refers to "Twin Oaks (a County maintained right-of-way) for the southwesterly corner of Lot 74[,]" and the western boundary line of his lots runs along Twin Oaks Road.

When asked how Echols started traveling across his property to what Patton calls the "Patton easement[,]" Coetzee stated, "I told [Chase] one afternoon, make him a road to cross my property [and] [y]ou and your family can cross the north side of my property[]" because Chase Echols had an argument with a neighbor to the south. According to Coetzee, he also told Chase to get permission from Patton.

Coetzee agreed that Chase accepted the offer and within a few weeks, there were machines digging out dirt. Coetzee testified that the road Chase built runs along the north side of Coetzee's tract, from the northeast corner to the northwest corner, just south of his northern fence. According to Coetzee, when Patton saw the road Chase built, Patton was upset with Coetzee, and Coetzee told Patton he gave Chase permission to cross and, as neighbors, they needed to work it out. Coetzee testified that, before Chase built the road, Chase got a survey, and Chase dug out dirt, laid down clay and heavy rock, and compacted the material, and the work was "better than what the county road's been built." According to Coetzee, Chase offered to buy the area where he built the road and Coetzee told him no, and Chase did not give Coetzee any money or gifts to use the area.

Coetzee testified that initially, the only people using the road were the Echols family, but over time, there has been more traffic. He asked Chase to tell people to slow down because of the children and animals, he observed heavy equipment and 18-wheelers on the road, and after Hurricane Imelda, the bridge on Twin Oaks was damaged. According to Coetzee, when he asked Chase about the heavy equipment, Chase told him that Bent Equipment—Jamie's and Chase's business—did heavy equipment repair, but Coetzee did not know that was their business when he gave permission to build the road, even though Coetzee had seen log trucks and heavy machinery going to the Echols' property. Coetzee testified that he was concerned

16

because the bridge on Twin Oaks is only wide enough for one vehicle to pass at a time.

According to Coetzee, Echols could still have used Lawrence Creek Road because that road still exists. Coetzee testified that traffic across the road Chase built had decreased, and Jamie and Chase Echols exited their property on the northeast side to Hales Road.[10] Coetzee testified that he never gave permission to allow Bent Equipment to cross his property. Coetzee also testified that Chase built a fence along the eastern boundary of Coetzee's property, and although Coetzee offered to pay half the cost, Chase did not let him pay. Coetzee stated he was asking the court "[t]o stop all access across [his] property from the east to the west."

On cross-examination, Coetzee testified that he slept fine, he was not seeing a psychiatrist or other doctor for mental problems, and he had no emotional distress. When asked what outrageous thing Chase had done to cause mental anguish, Coetzee testified that Chase had used a racial slur and that Coetzee had been disrespected and cursed at several times. Coetzee testified that he was not aware he had sued the Echols for trespassing; he agreed he gave Jamie and Chase Echols permission to cross his land; and that in reliance on that permission, Chase cleared

---

[10] One map admitted into evidence shows that Hales Road, which runs generally east and west, connects with both Lawrence Creek Road and Twin Oaks Road; however, another map also in the record shows that Hales Road does not connect to the area of the lots in question.

17

the land and built a road. According to Coetzee, the road Chase built is 25-feet wide except at the corner of Lot 48 where the road is 90-feet wide to accommodate turns. Coetzee also agreed that, in addition to building a road, Chase put a culvert under Coetzee's driveway, set the culvert in stabilized sand, and did not charge Coetzee for the work. Coetzee agreed that the use of his land by Chase and Jamie Echols and their friends "is all consistent with [] being used for ingress and egress purposes."

Coetzee further testified that he told Chase that Chase could put a road on a strip of land across Coetzee's property because when trucks left the Echols' property, they had to go up a steep incline to get to Highway 105, and it was a dangerous situation. Coetzee also agreed that he was aware that Chase brought logging trucks onto the Echols' property for business, but he was not aware of the other equipment Chase had for Bent Equipment when he offered Chase to use the northern part of Coetzee's land to get to Twin Oaks Road.

Coetzee testified that he made a "mistake[]" when he stated in his affidavit that Patton owns an easement. He also testified that he was not aware that in his Application for injunctive relief, Patton had alleged that he was conveyed an exclusive private easement. Coetzee testified that, after he purchased his lots, he had the property surveyed to determine the southern boundary, a surveyor identified a "stake right on the edge of Twin Oaks[]" and Coetzee agreed that his property ends

18

where Twin Oaks Road begins and that Twin Oaks Road forms the western boundary of his tract.

Testimony of Jamie Echols

Jamie Echols testified that she lived at 686 Twin Oaks in Cleveland, Texas, and she had lived there for twenty years. She also testified that she is the president of Bent Equipment, and the corporate filings give an address for the company at 671 Lawrence Road. According to Jamie, at one point, she and Chase had gone out of town, and when they returned, their alarm system was going off, and a police officer told them they needed to change their address to 671 Lawrence Creek Road because the police could not find 686 Twin Oaks Road. Jamie testified that Twin Oaks Road is north of Highway 105, and south of the highway, the road is called California Avenue.

According to Jamie, before Coetzee lived on his property, she would take Twin Oaks around what is now Coetzee's property, over to Lawrence Creek, and up to her house. Jamie testified, "Lawrence Creek floods, and when it rains, [] it's not passable. So that's the reason why they built the bridge there[.]" Another way she accessed her property was Lawrence Creek Road, but she cannot enter or exit her property from Hales Road.

Jamie agreed that the deed to Chase for Lot 47 shows the property address at 671 Lawrence Creek Road. She also agreed that her mailbox is at the end of

Lawrence Creek Road, but she did not agree there was ingress and egress to Lot 47 through Lawrence Creek Road. She testified that they also have a mailbox that says "686 Twin Oaks" on Twin Oaks Road where it intersects with Highway 105, and that is the only mailbox where her family gets mail. According to Jamie, they stopped using Lawrence Creek Road to get to and from their house because it is a dirt road that floods almost every time it rains. Jamie testified that they did not use dirt and gravel to build up Lawrence Creek Road "[b]ecause [the materials] would wash downcreek." Jamie testified that she believed that the road Chase built across Coetzee's property lies within the 30-foot portion of the road easement on the northern boundary of Lots 47 and 48 shown on a 2008 survey, which was admitted into evidence.

Jamie agreed that, at some point, Coetzee talked to Chase about Echols crossing along his northern boundary line to get to Twin Oaks Road. According to Jamie, where Lawrence Creek Road meets Highway 105, there is a very steep incline, and because it is a dirt road with pea-size gravel, when trucks pass on the road, the tires spin, but the trucks do not have that problem on Twin Oaks Road. Jamie recalled that Chase and Coetzee talked about which trees to keep and the ones to cut down. Jamie agreed that Chase used heavy equipment to push out trees and Chase also ground the remaining stumps, then excavation work began. Jamie also agreed that clay material and road base were brought in. According to Jamie, she

and her husband spent about $50,000 building a road across Coetzee's property. She also testified that she and Chase had done other things to help Coetzee, including clearing trees from other areas of his property, putting in a new culvert under his driveway, and letting him use their Kubota tractor.

Jamie agreed there was a bridge on Twin Oaks Road over Lawrence Creek, there were issues with the bridge after Hurricane Imelda, and she called one of the County Commissioners about it. According to Jamie, the bridge was only used by Jamie and Chase, Coetzee and his wife and children, and Patton. Jamie also testified that there is not a bridge over the creek on Lawrence Creek Road. According to Jamie, "crackheads" live on the property southeast of her on Lawrence Creek Road, and Coetzee had confrontations with them.

According to Jamie, she has had problems getting mail because Patton went to the postal service about her address, and she had to speak to the postmaster in Cleveland because Coetzee had made complaints:

> [B]asically our address was voided because someone decided that they were going to mess with our mail and say that [] we don't live there and that it's voided. So my mail has not been able to be delivered, my packages for my businesses and personal, medication and stuff like that. So I've had to spend numerous [] hours on the phone, at the post office in Cleveland, trying to get this situated, and the 911 address because they cannot find us because [] we were told that we do not exist. So if I have an emergency with one of my family members, they cannot get to us.

21

According to Jamie, she heard Coetzee tell delivery drivers, "Slow down or I'm going to kill you." She also testified that Coetzee had threatened to kill a Bent Equipment employee. Jamie further testified that Coetzee's son came to their house with a pistol complaining about her son, which she found threatening. Jamie testified that Coetzee also called Montgomery County Environmental to complain about dumping on her property, and after police officers came out, they determined that Coetzee was mistaken. She also recalled that Ms. Coetzee had complained about Jamie's son trespassing when he was walking down the driveway. Jamie also testified that "someone" had called her customers' drivers to complain about them being overloaded and trespassing after the temporary injunction was entered. And she testified that Coetzee threatened to burn her equipment when he was served with the writ of injunction.

Testimony of Chase Echols

Chase testified that he retired in 2014 from the railroad, where he worked for eighteen years as a conductor and superintendent. He explained that he owns log trucks that he leases out, and the trucks come back to his property for maintenance and repair. He testified that Bent Equipment repairs heavy equipment, it began operating in 2016, and it shut down about six weeks before trial. He explained why he and his wife were shutting down Bent Equipment: "All my customers were getting calls that they were going to be turned in for being overweight crossing a

22

bridge. . . . They [] saw what had happened to my wife and didn't want to be [a] part of it[.]" Chase further testified that his wife had gotten into a "confrontation" with Patton's father over putting up a gate, and Patton's father filed criminal charges against Jamie, although the charges were eventually dismissed. After this incident, Chase's family had to pay for a criminal defense attorney, and his employees were reluctant to keep working.

Chase testified that, when he first bought his property, there was a low-water crossing but no bridge at Lawrence Creek, and at some point, "[t]he commissioner[s] built a bridge there[,]" and Chase and his family would turn in front of Coetzee's house. At some point, Coetzee put a gate across the road, and after culverts were put in at Lawrence Creek, Chase used that route. According to Chase, "crackheads" with multiple felony charges live south of him and he has had disagreements with them, and Coetzee offered to allow Jamie and Chase Echols to pass through his property because Chase's trucks risk having an accident trying to climb the hill at Lawrence Creek. Chase explained that he built a driveway for Coetzee, digging up about two feet of topsoil and laying in two feet of clay "because [he] was hauling 18-wheelers through there[]" and he did not want to tear up the land. At some point he got home after an out-of-town trip, and he was "served a letter" telling him he could not "use the driveway [any] more." He agreed that, since April 30, 2022, he had accessed his property at Lot 47 with permission from a cousin—Sheryl Hales—who lives next

23

door. Chase testified that, at the time of trial, he could not get out via Lawrence Creek Road because it is blocked, and the neighbors[11] to the south have now erected a gate that requires a code. Chase agreed that at one point he took down the gate at Twin Oaks Road when Patton "locked [Chase's] daughter [out] from going to school[,]" and when the gate was subsequently put back up, Chase's employees took it down because they were locked out.

Chase recalled that Coetzee offered for him to build a road on the north side of Coetzee's property in about 2017 after a hurricane, and Chase recalled Coetzee making the point that a road across Coetzee's property would be safer for Chase's trucks than climbing the hill on Lawrence Creek. Chase testified that he built a road based on Coetzee's offer, including clearing a right-of-way, excavating, refilling with about eighty loads of clay, laying down steel slag, packing the road materials, and installing culverts. Chase further explained that the road was about ninety feet at one end so the trailers could make the turn. According to Chase, when Coetzee made the offer, he did not include conditions on the use of heavy trucks. Chase testified that he spent about $50,000 building the road plus his own and his employees' labor. Chase further testified that he also removed several trees for Coetzee that were not in the road easement, and he put a culvert under Coetzee's driveway. Chase explained that, before he put in the culverts, Patton's pond

---

[11] These neighbors are not parties to this lawsuit.

24

overflowed onto Coetzee's land, so he put in culverts along the northern part of Coetzee's property "because Mr. Patton's pond outflow [] would cross over the road" otherwise. Chase agreed that the road he built runs "along the common fence line that is between Lots 48 and 31"—the existing fence between Coetzee's and Patton's lots—and the road is about 25 feet in width. Chase agreed that the road ends at Twin Oaks Road on the west side of Coetzee's property line.

According to Chase, the main reason he wanted to use Coetzee's property was because his 18-wheelers had trouble with Lawrence Creek Road. Chase also testified that, if the creek was flooding, his family would not be able to get to safety. Chase testified that Bent Equipment was not then operating, and whether it would operate again "depend[ed] on if all the harassment stops." According to Chase, "I spent 50,000 to go across a good bridge where my family's safe." Chase did not understand Coetzee to be giving his family "exclusive" access to cross Coetzee's property.

Chase testified that, when Coetzee told him he could use his property for access, Chase had hauling equipment, including logging trucks and haul trailers, but customers were not bringing heavy equipment in on a daily basis at that point. Chase agreed that, before this lawsuit, he and Coetzee talked because Coetzee had issues with "bigger equipment and bigger trucks going through." He also testified that Coetzee has heavy trucks come to his property, including an 18-wheeler and a dumpster truck. Chase testified that when Coetzee built a "barndominium," concrete

25

trucks crossed over the bridge on Twin Oaks to get to Coetzee's property, Coetzee also had fertilizer delivered in an end-dump 18-wheeler about four times a year, Coetzee has had building materials delivered by heavy trucks, and Coetzee has had numerous heavy loads of hay shipped out on a 40-foot trailer.

Chase testified that, on the day he received a letter telling him to stop crossing Coetzee's property, he took Coetzee a check, although Coetzee had previously not said Chase had to pay for the road. Chase recalled that, when he took the check to Coetzee, Coetzee first said the road was not for sale, but then he told Chase he wanted $300,000 to use the road across his land. Chase did not pay Coetzee $300,000.

Chase agreed that the County has accepted one mile of Twin Oaks Road north of Highway 105 up to the road that he built on Coetzee's property. He also agreed that the deed under which he took his lots refers to the original plat recorded in 1913, as do Patton's and Coetzee's deeds. Chase further agreed that Twin Oaks Road is necessary for him to have access to his property. He agreed he was asking the trial court to declare that Patton does not have an exclusive private easement but rather he has a nonexclusive easement that is for use by the public, that the roads shown on the plat are for use by the public and have not been abandoned, and Patton had no right to put up a gate on a public road. Chase agreed there was nothing in writing about Coetzee letting him use his property to build a road. Chase also testified that

there was a confrontation between Chase and Coetzee, but Chase said he did not use a racial slur.

## The Trial Court's Final Judgment

After the trial concluded, the trial court sent the parties' attorneys an email stating how the court planned to rule. Then on July 28, 2022, the trial court signed the Final Judgment, ruling in relevant part[12] as follows:

> It is ORDERED, ADJUDGED, and DECREED that Kevin Patton take nothing on each claim he pled in this cause.
> It is ORDERED, ADJUDGED, and DECREED that Willem A. Coetzee take nothing on each claim he pled in this cause.
> It is DECLARED, ORDERED, ADJUDGED and DECREED that Twin Oaks Road is dedicated to the public and accepted by Montgomery County.
> It is DECLARED, ORDERED, ADJUDGED and DECREED that Twin Oaks Road has not been abandoned.
> It is DECLARED, ORDERED, ADJUDGED and DECREED that the southern end of Twin Oaks Road is where it intersects State Highway 105 East, that Twin Oaks Road continues northerly from State Highway 105 East to its northern end, and Twin Oaks Road's northern end is located thirty feet beyond the fence line set on the southern boundary of Security lot 31.
> It is DECLARED, ORDERED, ADJUDGED and DECREED that no fences, gates, or obstructions are permitted on Twin Oak[]s Drive.
> It is DECLARED, ORDERED, ADJUDGED and DECREED that Chase Echols, as the record Owner of Security lot 47 and part of Security lot 58 (collectively the "Echols Tract") and his spouse, children, employees, guests, licensees, agents, customers, invitees, and occupants of the Echols Tract, have a permanent easement for free and

---

[12] The Final Judgment also awarded court costs and interest to the Echols and Bent Equipment and provided for an award of attorney's fees after any motion for new trial and for appeal. We do not discuss these items because they are not at issue in this appeal.

uninterrupted ingress to and egress from the Echols Tract to Twin Oaks Road, which easement runs with the Echols Tract, and is located on and over a strip of land located in the northern portion of Security Lot 48 as described herein (the "Easement"). The Easement's northern boundary is the apparent boundary line between Security lot 31 and Security lot 48. The Easement's eastern boundary is a line 25.17 feet in length located on the northern end of the western boundary of Security lot 47. The Easement's western boundary is a line 115.2 feet in length located on the northern end of the eastern boundary of Twin Oaks Road. The Easement's southern boundary is a line parallel with the apparent boundary line between Security lot 31 and Security lot 48, but twenty-five feet south of that line. The Easement includes a turn-in area of a quarter of a circle having a radius of 90 feet, which begins at a point on the easement's southern boundary that is 90 feet east of the eastern line of Twin Oaks Road, and is a curve to the right having a radius of 90 feet which terminates at the point it intersects the eastern line of Twin Oaks Road 115.2 feet south of the Easement's northern boundary line.

It is DECLARED, ORDERED, ADJUDGED and DECREED that no fences, gates, or obstructions are permitted on the Easement.

It is DECLARED, ORDERED, ADJUDGED and DECREED that Kevin Patton has no private easement on Twin Oaks Road.

It is DECLARED, ORDERED, ADJUDGED and DECREED that Kevin Patton has no express easement on Twin Oaks Road.

It is further DECLARED, ORDERED, ADJUDGED and DECREED that Chase Echols, Jamie[]Echols, and Bent Equipment, Inc. have and recover from Kevin Patton their attorney's fees for the trial of this Cause in the sum of $33,121.00, for which let execution issue. . . .

Motion for New Trial, Request for Findings of Fact and Conclusions of Law

On August 16, 2022, Patton filed a request for written findings of fact and conclusions of law. On August 29, 2022, Patton and Coetzee filed Motions for New Trial. The motions were overruled by operation of law. *See* Tex. R. Civ. P. 329b(c).

Findings of Fact and Conclusions of Law

The trial court entered findings and conclusions, as follows:

28

## Findings of Fact

1. The plat of Security Subdivision is recorded in Volume 1, Pages 21 and 22 of the Map Records of Montgomery County, Texas. This is the same plat that is recorded in Volume 27, Page 515 of the Real Property Records of Montgomery County, Texas. A true and correct copy of this plat was admitted into evidence as Exhibit 102 (the "Plat").

2. The Plat depicts 60-feet wide roads.

3. The developer of Security Subdivision is South Texas Development Company (the "Developer").

4. On September 2, 1911, the Developer conveyed Lots 48 and 57 in Section 2 of the Security Subdivision to J.S. Ellis, Trustee. A true and correct copy of this deed was admitted into evidence as Exhibit 116, and the descriptive language therein explicitly references the Plat.

5. On September 6, 1911, J.S. Ellis, Trustee, conveyed Lots 48 and 57 in Section 2 of the Security Subdivision to Julia G.D. Porter. A true and correct copy of this deed was admitted into evidence as Exhibit 117, and the descriptive language therein explicitly references the Plat.

6. On November 6, 1913, the Developer conveyed Lot 47 in Section 2 of Security Subdivision to W.B. Renn, Trustee. A true and correct copy of this deed was admitted into evidence as Exhibit 109, and the descriptive language therein explicitly references the Plat.

7. On November 10, 1913, W.B. Renn, Trustee, conveyed Lot 47 in Section 2 of Security Subdivision to Fred E. and Emma R. Helwig. A true and correct copy of this deed was admitted into evidence as Exhibit 109A, and the descriptive language therein explicitly references the Plat.

8. On January 6, 1914, the Developer conveyed Lots 21 and 32 in Section 2 of the Security Subdivision to W.B. Renn, Trustee. A true and correct copy of this deed was admitted into evidence as Exhibit 112, and the descriptive language therein explicitly references the Plat.

9. On January 6, 1914, W.B. Renn, Trustee, conveyed Lots 21 and 32 in Section 2 of the Security Subdivision to Mike J. Burger. A true and correct copy of this deed was admitted into evidence as Exhibit 113, and the descriptive language therein explicitly references the Plat.

10. On November 29, 1940, Mike Burger and Matilda Burger conveyed Lots 21 and 32 in Section 2 of the Security Subdivision to M.J. Hales. A true and correct copy of this deed was admitted into evidence as Exhibit 113A, and the descriptive language therein explicitly references the Plat.

11. On February 13, 1947, the Developer conveyed to Gladstell Lumber Company twenty-five separate tracts of land. The "Twenty Fourth Tract" contained all of the land remaining in Section 2 of the Security Subdivision that had not yet been conveyed and explicitly referenced the Plat. Since Lots 21, 31, 57, and 74 had already been conveyed, the Twenty Fourth Tract necessarily included Lots 22, 32, 47, and 48.

12. On May 19, 1956, Gladstell Lumber Company conveyed all of the land comprising the "Twenty Fourth Tract" to Grogan Brothers Lumber Company *less acreage deeded for roadways*.

13. On June 10, 1959, the Grogan Brothers Lumber Company and Hay Grogan conveyed all of the land conveyed to them by Gladstell Lumber Company to the Baptist Foundation of Texas.

14. On August 15, 1959, Ethel Ebaugh, Helen Ebaugh DeBell, Donald W. DeBell, Elwin Ebaugh, Wilma Ebaugh Harlon, and James Harlon conveyed Lots 23 and 31 in Section 2 of the Security Subdivision to G.B. Williams. A true and correct copy of this deed was admitted into evidence as Exhibit 115, and the descriptive language therein explicitly references the Plat.

15. On September 24, 1964, Julia G.D. Porter conveyed Lots 48 and 57 in Section 2 of the Security Subdivision to J.A. Hannon.

16. On August 18, 1972, the Baptist Foundation of Texas conveyed Lot 58 in Section 2 of the Security Subdivision to James H. Davis and Madelaine Davis. A true and correct copy of this deed was admitted into evidence as Exhibit 110B.

17. On May 10, 1973, J.A. Hannon conveyed Lots 48 and 57 in section 2 of the Security Subdivision to Elliott Reagan.

18. On September 14, 1976, Elliott Reagan granted a 30-feet wide "easement and right-of-way for a non-exclusive private road" across Lot 48 in Section 2 of the Security Subdivision "for the purpose of ingress and egress to and from Lots 31 and 22 of the said Subdivision."

19. On December 2, 1976, the Baptist Foundation of Texas conveyed Lots 22 and 31 in Section 2 of the Security Subdivision and a 30-feet wide easement and right-of-way across Lot 48 in Section 2 of the Security Subdivision to The Veterans Land Board of the State of Texas.

20. In its conveyance of the 30-feet wide easement to The Veterans Land Board of the State of Texas, the Baptist Foundation of Texas reserved the use of the easement for any purpose not inconsistent with The Veterans Land Board of the State of Texas' use of the easement.

21. On January 7, 1981, J.H. Davis and Madeline Davis conveyed one acre out of Lot 58 in Section 2 of the Security Subdivision to Kenneth Jordan and Janice Jordan. A true and correct copy of this deed was admitted into evidence as Exhibit 110A.

22. On January 22, 1990, the Montgomery County Commissioner's Court issued an "Order for Partial Abandonment of Security Subdivision," that states, in pertinent part:

> WHEREAS, heretofore there have been dedicated those certain lots *and roadways* in that certain subdivision known as Security Subdivision, a subdivision in Montgomery County, Texas, as per plat duly recorded in Volume 1, Pages 21 and 22 of the Map Records of Montgomery County, Texas;
>
> . . .
>
> WHEREAS, Applicant has shown that said lots and roadways in *that* portion of Security Subdivision to be cancelled have never been formally constructed or subdivided and have not been used as dedicated roads by the public;
>
> . . .

A true and correct copy of this January 22, 1990 Order for Partial Abandonment of Security Subdivision was admitted into evidence as Exhibit 103.

23. The Court finds that the roads shown on the Plat were dedicated to the public.

24. On July 21, 1994, Barbara Lynn Maddox and Thelma Lou Estrada conveyed lots 21 and 32 to Freddie Earl Echols and Linda Hales Echols.

25. On November 25, 1997, Flagstar Bank conveyed Lot 47 in Section 2 of Security Subdivision to Chase Echols. A true and correct copy of this deed was admitted into evidence as Exhibit 104, and the descriptive language therein explicitly references the Plat.

26. On August 24, 2007, Michael Cherry, Patricia Ann Tibbs, and Gary Ross Reagan conveyed Lots 48, 57, and 74 in Section Two of the Security Subdivision to Willem A. Coetzee. A true and correct copy of this deed was admitted into evidence as Exhibit 107, and the descriptive language therein explicitly references the Plat.

27. Willem A. Coetzee owns Lots 48, 57, and 74 in Section 2 of Security Subdivision (Collectively, "Coetzee Tracts"). The Coetzee Tracts are colored blue on Exhibit 101.

28. The Coetzee Tracts are bounded on the west by Twin Oaks Road.

29. On December 18, 2007 Linda Hales Echols and Freddie Earl Echols deeded the northernmost 1 acre of Lot 58 in Section 2 of Security Subdivision to Chase Echols. A true and correct copy of this deed was admitted into evidence as Exhibit 105, and the descriptive language therein explicitly references the Plat.

30. Chase Echols owns Lot 47 and the northern half of Lot 58 in Section 2 of Security Subdivision (collectively, "Echols Tracts"). The Echols Tracts are colored yellow on Exhibit 101.

31. On June 11, 2014, The Veterans Land Board of the State of Texas conveyed Lots 22 and 31 in Section 2 of the Security Subdivision to Freddie Earl Echols.

32. The Veterans Land Board of the State of Texas did not convey any easement across Lot 48 to Freddie Earl Echols.

33. On August 12, 2015, Freddie Earl Echols conveyed Lots 21, 22, 31, and 32 in Section 2 of Security Subdivision to Kevin Patton. A true and correct copy of this deed was admitted into evidence as Exhibit 106, and the descriptive language therein explicitly references the Plat.

34. Kevin Patton owns Lots 21, 22, 31, and 32 in Section 2 of Security Subdivision (collectively, "Patton Tracts"). The Patton Tracts are colored red on Exhibit 101.

35. When Freddie Echols owned Lots 21, 22, 31 and 32, Twin Oaks Road went all the way from State Highway 105 up to his land and veered left into the Greenbelt subdivision.

36. When Kevin Patton purchased Lots 21, 22, 31, and 32 from Freddie Echols, he never objected to the reference to the Plat in the deed or mentioned anything about the Security Subdivision being abandoned.

37. Freddie Earl Echols relied on the Plat in selling Lots 21, 22, 31, and 32 to Kevin Patton.

38. The Veterans Land Board never made any warranties to Freddie Earl Echols beyond what was contained in the deed.

39. The official records of Montgomery County show that the county accepted one mile of Twin Oaks Road, which includes the length of Twin Oaks Road in dispute in this lawsuit.

40. Montgomery County does not rely on plats that have been abandoned.

41. Without the roadway easements shown on the Plat, the Echols Tract is landlocked.

42. Without the roadway easements shown on the plat, the Patton Tract is landlocked.

43. Chase Echols, Jamie Echols, and Bent Equipment, Inc. previously entered and exited the Echols Tract through the south of Lot 57 traveling over Lawrence Creek and eventually exiting directly onto State Highway 105. That right-of-way, to the extent any even existed, was washed out during Hurricane Harvey and became unpassable.

44. There is a bridge on Twin Oaks Drive where the roadway crosses over Lawrence Creek.

45. Montgomery County maintains Twin Oaks Drive north of the bridge.

46. Willem A. Coetzee agreed that Chase Echols, Jamie Echols, and Bent Equipment, Inc. could construct a road in the roadway area north of Lot 48 as shown by the Plat.

47. At the time Willem A. Coetzee agreed to let Chase Echols, Jamie Echols, and Bent Equipment, Inc. construct a road across the northernmost boundary of Lot 48, he knew that Bent Equipment, Inc. was a company in the business of repairing heavy machinery and that heavy machinery was routinely transported to the Echols Tract and out of the Echols Tract.

48. Chase Echols and Jamie Echols expended a large sum of money to construct a road across the northernmost boundary of Lot 48.

49. At no time during the construction of the road across the northernmost boundary of Lot 48 did Willem A. Coetzee ever tell Chase Echols and Jamie Echols to halt construction.

50. Bent Equipment, Inc. requires a turning radius of 90-feet in order to transport heavy machinery to and from the Echols Tract.

51. Kevin Patton does not have a private and/or exclusive right-of-way across Lot 48.

52. There is no factual basis to support Willem A. Coetzee's claim for intentional infliction of emotional distress.

53. Chase Echols, Jamie Echols, and Bent Equipment, Inc. incurred $33,121.00 for the trial of this case, which is a reasonable and necessary sum.

. . . .

33

## Conclusions of Law

1.      There has been no common law abandonment of the portion of Twin Oaks Road that begins at State Highway 105 and ends 30-feet beyond the southernmost fence line of Lot 31.

2.      There is insufficient evidence to support Willem A. Coetzee's claim for intentional infliction of emotional distress.

3.      Jamie Echols, Chase Echols, and Bent Equipment, Inc. did not trespass across Willem A. Coetzee's real property.

4.      Willem A. Coetzee is not entitled to an award of attorney's fees.

5.      Kevin Patton does not have a private easement across Twin Oaks Road.

6.      Kevin Patton does not have an exclusive easement across Twin Oaks Road.

7.      Twin Oaks Road was dedicated to the public and accepted by Montgomery County.

8.      Chase Echols, Jamie Echols, and/or Bent Equipment have not intentionally diverted the natural flow of surface waters off in such a manner that damages Kevin Patton.

9.      Twin Oaks Road has not been abandoned, either statutorily or at common law.

10.      Kevin Patton has not adversely possessed any of the roads shown on the Plat.

11.      Kevin Patton is not entitled to an award of attorney's fees.

12.      No fences, gates, or obstructions are permitted on Twin Oaks Road.

13.      Chase Echols, Jamie Echols, and Bent Equipment, Inc. have an easement for ingress and egress to Lot 47 and Lot 58 that is located on the road they built across the northernmost boundary of Willem A. Coetzee's property.

14.      Jamie Echols, Chase Echols, and Bent Equipment, Inc. shall recover their reasonable and necessary attorneys' fees for trial from Kevin Patton.

15.      Jamie Echols, Chase Echols, and Bent Equipment, Inc. shall recover their reasonable and necessary attorneys' fees for appellate proceedings from whichever of Kevin Patton or Willem A. Coetzee that prosecuted the appellate proceeding.

Post-Judgment Motion to Enforce Final Judgment
and Request for Sanctions and Hearing

About two months after entry of the Final Judgment, the Defendants filed a Motion to Enforce Final Judgment and Request for Sanctions. Therein, Defendants alleged that Coetzee had obstructed Defendants' use of Twin Oaks Road by putting up a fence and gate across the road. Defendants' further alleged that Coetzee had placed posts in the middle of Twin Oaks Road because Coetzee "believes that most of Twin Oaks Road is on his land, [and] he is within his rights to obstruct its use[.]" Defendants requested that the trial court enter an order requiring Coetzee to remove the posts, fencing, and obstructions he installed on Twin Oaks Road; set a hearing to determine whether Coetzee complied with such order; and compelling Coetzee to have a geotechnical engineer inspect the work and certify that the road was properly repaired. Defendants also requested that the trial court assess sanctions against Coetzee for at least as much as the amount of Defendants' attorney's fees incurred in seeking compliance.

At a hearing on the motion, Chase testified that posts, fencing, and gates had been placed in the middle of Twin Oaks Road that did not allow enough room for Chase and his family or emergency vehicles to pass outside the new fence line. He also testified there was a new barbed-wire fence around Coetzee's property that did not hold Coetzee's sheep in, and the sheep walked through the fence. Chase agreed that both Patton and Coetzee had placed "no trespassing" signs on Twin Oaks Road,

even though the trial court had declared it a public road. Chase further testified that Patton had called his customers and told them they could not cross the bridge on Twin Oaks because their equipment was too heavy and that Patton would turn them in to the constable. Photo exhibits were admitted into evidence showing the new fencing and posts placed in the middle of the road.

According to Chase, based on post-judgment actions by Patton and Coetzee in erecting new fencing and gates, Patton and Coetzee had precluded him, his wife, and their business from using Twin Oaks Road or the easement over the north side of Coetzee's property. Chase testified that he had lost $158,333 per month "gross business," and about 35% or $55,416 of that amount would represent his expected profit, totaling about $110,000 in lost profits over the two months since the Final Judgment. Chase also testified that a customer's piece of heavy equipment was stuck on Chase's property due to the obstructions on Twin Oaks Road, on which the customer owed about $52,000.

Jeff Moon, a surveyor, testified that Patton asked him to locate lines on Coetzee's property because Coetzee had asked Patton to help him with a fence and because boundary points were lost during Hurricane Imelda. According to Moon, Patton was the "driving force" in getting Moon to do a survey, and Coetzee only hired him to mark a 30-foot easement. Moon agreed that, in his work, he shows a common lot line with a 30-foot easement on each side, or a total of a 60-foot

easement. Moon testified that, in this case, the property line was in the middle of Twin Oaks Road "because somebody's told us it's called Twin Oaks Road[,]" and to the east of the posts that were set on Coetzee's actual property line was a 30-foot road easement.

Coetzee testified that Patton told him to contact Jeff Moon and to put up a fence in the road so that only Patton would have access to the 30-foot easement to the east of the new fence. Coetzee agreed that when he and Patton put a fence in the middle of Twin Oaks Road, Coetzee knew that the court had declared Twin Oaks Road a public road that was not to be blocked and that Patton had no public or private easement on that part of Coetzee's property.

At the conclusion of the hearing, the trial court concluded that Patton was the "driving force," that Patton and Coetzee acted in bad faith, and that they intentionally disregarded the court's Final Judgment. After the hearing, the trial court signed an order granting Defendants' Motion to Enforce Final Judgment and Request for Sanctions. Therein, the trial court ordered Patton and Coetzee to remove the fence, posts, gates, and obstructions placed in Twin Oaks Road; to fill holes where posts were removed; and to mark the location of filled holes. The trial court assessed sanctions of $20,000 against Coetzee and $31,885 against Patton and set a date for a compliance hearing.

Patton filed a notice of appeal of the Final Judgment and of the Order Granting Motion to Enforce Final Judgment and Request for Sanctions, and Coetzee filed a notice of cross-appeal of the Final Judgment only.

Issues

Patton's issues on appeal are as follows:

1. The trial court erred in granting relief not related to any cause of action presented by the Echols' pleadings, and the causes of action were not tried with Patton's consent.
2. The trial court erred in finding that the subdivision Plat had not been abandoned.
3. The trial court erred by failing to find that the purported roads surrounding Lots 21, 22, 31, and 32 shown on the Plat had not been abandoned by common law or statutorily, or adversely possessed and no longer exist.
4. The trial court erred in finding that the Patton Property was landlocked and that Patton had no easement to his property because Patton's predecessors in title were granted an express easement that was an easement appurtenant.
5. The trial court abused its discretion and erred by awarding the Echols attorney's fees when the relief granted to the Echols was on a cause of action that the Echols did not plead.
6. The trial court erred in awarding sanctions against Patton because the evidence of lost business profits was too speculative.

Coetzee's issues on appeal are as follows:

1. The trial court erred by granting the Echols relief that was not requested in their pleadings.
2. Assuming the issue of easement by necessity was before the trial court, the trial court erred in finding that the Echols had an easement by necessity across the Coetzee property.
3. The trial court erred in granting sanctions against Coetzee.

38

## Standard of Review

In a bench trial, the trial court determines the credibility of the witnesses and the weight to be given their testimony. *Forest Hills Improvement Ass'n v. Flaim*, No. 09-15-00478-CV, 2017 Tex. App. LEXIS 10528, at *5 (Tex. App.—Beaumont Nov. 9, 2017, no pet.) (mem. op.) (citing *Woods v. Woods*, 193 S.W.3d 720, 726 (Tex. App.—Beaumont 2006, pet. denied)). In resolving factual disputes, the trial court may believe one witness and disbelieve others, and it may resolve any inconsistencies in a witness's testimony. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). In making credibility determinations, the factfinder "cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted." *City of Keller v. Wilson*, 168 S.W.3d 802, 820 (Tex. 2005). The factfinder is also not "free to believe testimony that is conclusively negated by undisputed facts." *See id.* However, if the factfinder could reasonably believe the testimony of one witness or disbelieve the testimony of another witness, the appellate court "cannot impose [its] own opinions to the contrary." *See id.* at 819. When, as here, the trial court makes findings of fact and conclusions of law, an appellate court reviews the trial court's legal conclusions de novo and fact findings for evidentiary support. *See City of Beaumont v. Spivey*, 1 S.W.3d 385, 389 (Tex. App.—Beaumont 1999, pet. denied).

A trial court's findings of fact in a bench trial carry the same weight as a jury's verdict, and we review the evidence supporting them under the same standards for determining if sufficient evidence supports a jury answer. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Sheetz v. Slaughter*, 503 S.W.3d 495, 502 (Tex. App.—Dallas 2016, no pet.). Findings of fact supported by the evidence are binding if the appellate record contains a reporter's record. *Sheetz*, 503 S.W.3d at 502. For a factual-sufficiency challenge, we consider and weigh all the evidence in a neutral light and set aside the finding only if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Morris v. Wells Fargo Bank, N.A.*, 334 S.W.3d 838, 842 (Tex. App.—Dallas 2011, no pet.). We may not substitute our judgment for that of the factfinder if the evidence falls "within [the] zone of reasonable disagreement." *See City of Keller*, 168 S.W.3d at 822; *Sheetz*, 503 S.W.3d at 502.

We review the trial court's conclusions of law de novo and will affirm if the trial court correctly drew the legal conclusion from the facts. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002); *Sheetz*, 503 S.W.3d at 502. We will reverse the trial court's judgment only if the conclusions of law are erroneous as a matter of law. *Sharifi v. Steen Auto., LLC*, 370 S.W.3d 126, 148 (Tex. App.—Dallas 2012, no pet.). We must uphold conclusions of law if "any legal theory supported by the evidence sustains the judgment." *Id.* (quoting *Bundren v. Holly*

*Oaks Townhomes Ass'n, Inc.*, 347 S.W.3d 421, 430 (Tex. App.—Dallas 2011, pet. denied)); *see also Samson Expl., LLC v. T.W. Moak & Moak Mortg. & Inv. Co.*, No. 09-18-00463-CV, 2020 Tex. App. LEXIS 443, at *20 (Tex. App.—Beaumont Jan. 16, 2020, no pet.) (mem. op.).

An appellant must challenge each independent ground that fully supports a complained-of ruling or judgment. *Oliphant Fin. LLC v. Angiano*, 295 S.W.3d 422, 423-24 (Tex. App.—Dallas 2009, no pet.); *Reynolds v. Guido*, 166 S.W.3d 789, 795 (Tex. App.—Dallas 2005, pet. denied). If an appellant fails to assign error to an independent ground that fully supports the complained-of ruling or judgment, we must accept the validity of that ground, rendering harmless any error in the ground challenged on appeal. *Oliphant Fin. LLC*, 295 S.W.3d at 424. Thus, we must overrule a challenge to fact findings that underpin a legal conclusion or disposition when other fact findings that also support that legal conclusion or disposition are not challenged. *Howeth Invs., Inc. v. City of Hedwig Vill.*, 259 S.W.3d 877, 889 (Tex. App.—Houston [1st Dist.] 2008, pet. denied); *see also Long v. Long*, 196 S.W.3d 460, 468-69 (Tex. App.—Dallas 2006, no pet.). The same is true if an appellant challenges only one legal conclusion on appeal, but more than one legal conclusion independently supports a judgment or ruling. *Howeth Invs., Inc.*, 259 S.W.3d at 889; *see also Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993) ("We have held

repeatedly that the courts of appeals may not reverse the judgment of a trial court for a reason not raised in a point of error.").

Generally, an appellant must direct an attack on the sufficiency of the evidence at specific findings of fact and conclusions of law rather than at the judgment as a whole. *Shaw v. Cnty. of Dallas*, 251 S.W.3d 165, 169 (Tex. App.—Dallas 2008, pet. denied). Unchallenged findings are binding on an appellate court, but we may review specific findings being challenged if we are able to fairly determine the findings that are being challenged from the brief. *Id.*; *In re M.S.F.*, 383 S.W.3d 712, 716 (Tex. App.—Amarillo 2012, no pet.).

Easement by Necessity

In his first issue, Appellant Patton argues that the trial court erred by granting relief not related to any cause of action that the Defendants pleaded, and the causes of action were not tried with Patton's consent. More specifically, he argues that the Echols' Counter-Claim did not ask the trial court to award them an easement by necessity. Patton argues that the trial court granted the Echols an easement over the northernmost boundary of Coetzee's property, even though they had not requested such an easement in their pleadings. Patton further argues that he did not consent to trial of these issues, and without his consent, there are no pleadings to support the trial court's Conclusion of Law No. 13, wherein the trial court concluded, "Chase Echols, Jamie Echols, and Bent Equipment, Inc. have an easement for ingress and

egress to Lot 47 and Lot 48 that is located on the road they built across the northernmost boundary of Willem A. Coetzee's property."

In his first issue, Appellant Coetzee argues that the trial court erred by granting the Appellees an easement by necessity because it was not specifically pleaded by the Appellees and because the matter was not tried by consent. According to Coetzee, the trial court granted Appellees an easement by necessity across Coetzee's property. And in his second issue, Coetzee argues that, even assuming the issue of an easement by necessity was tried by consent, the trial court erred by granting Appellees an easement by necessity across Coetzee's property.

Neither Patton nor Coetzee identify where the trial court's findings or conclusions, or where the Final Judgment granted Appellees an "easement by necessity." *See* Tex. R. App. P. 38.1(i) (requiring an appellate brief to cite to the record and to applicable authority). We find no mention of an easement by necessity in either the trial court's Final Judgment or its Findings of Fact and Conclusions of Law. Additionally, we conclude that Patton lacks standing to challenge the existence or nonexistence of an easement over Coetzee's property because Patton has not demonstrated that he has any ownership interest in Coetzee's property. *See Lance v. Robinson*, 543 S.W.3d 723, 743 (Tex. 2018) ("Because the Lances do not own the disputed area, they have no authority to deny the Robinsons access and no standing

to contest the alleged easement."). Therefore, these issues present nothing for our review, and we overrule Patton's first issue and Coetzee's first and second issues.

Roads in the Security Subdivision

In his second issue Appellant Patton argues that the Court erred in finding that the subdivision Plat for the Security Subdivision, had not been abandoned. And in his third issue, Patton argues that the roads surrounding his property (Lots 21, 22, 31, and 32) "have been abandoned by common law, statutory law, and/or were adversely possessed[.]" Patton argues that the evidence shows that the purported roads have been abandoned under the common law because they were never constructed, the land has been fenced and used for agriculture and homes, and it would be impossible to construct the purported roads now. He argues that the purported roads have been statutorily abandoned because about half of the land comprising the purported roads has been fenced for more than twenty-five years. He further argues that he has adversely possessed the land making up the purported roads. Although Patton does not specify which of the trial court's findings of fact or conclusions of law he challenges, the trial court's ninth conclusion states, "Twin Oaks Road has not been abandoned, either statutorily or at common law[,]" the trial court's tenth conclusion states, "Kevin Patton has not adversely possessed any of the roads shown on the Plat[,]" and the trial court's twenty-second finding states that the Montgomery County Commissions Court issued an order in 1990 that stated in part

44

that lots and roadways in the Security Subdivision have been dedicated. *See Howeth Invs., Inc.*, 259 S.W.3d at 888 (where an appellant does not identify the findings or conclusions he challenges, we construe the point of error liberally to address the merits if possible). We review a trial court's conclusions of law under a de novo standard of review. *See BMC Software Belg., N.V.*, 83 S.W.3d at 794.

In his original and amended Application, Patton did not ask the trial court to declare that the roads in the Security Subdivision generally nor Twin Oaks Road specifically had been abandoned or adversely possessed. Patton's amended request for declaratory judgment did ask the trial court to declare that Montgomery County had no interest in Twin Oaks Road or in the roads shown on the original plat.

All three landowners in this lawsuit—Patton, Coetzee, and Chase Echols—took their property under deeds that refer to Security Subdivision, Section Two according to the map or plat recorded in Volume 1, Page 21A of the Map Records of Montgomery County, Texas.

The Security Subdivision plat recorded in 1913 depicts the lots as well as streets and roads within the subdivision. Specifically, the plat shows "California Avenue" running north and south for the full length of the Security Subdivision, including the area running along the western side of Patton's lots 22 and 31 and Coetzee's lots 48, 57, and 74. A 1990 Order from the Montgomery County

Commissioner's Court pertaining to the abandonment of some lots in the Security Subdivision (lots not involved in this lawsuit) states,

> WHEREAS, heretofore there have been dedicated those certain lots and roadways in that certain subdivision known as Security Subdivision, a subdivision in Montgomery County, Texas, as per plat duly recorded in Volume 1, Pages 21 and 22 of the Map Records of Montgomery County, Texas[.]"

The record reflects that the Montgomery County Commissioner's Court accepted one mile of Twin Oaks Road into the County's Road Maintenance System on April 13, 1992. A memorandum by a County Engineer dated June 13, 1991, states, "There appears to be six houses that depend on [Twin Oaks Road] for access and four houses north of Lawrence Creek. These four houses have other access to State Highway 105, except during times when Lawrence Creek is at flood stage." Jamie Echols testified that Twin Oaks Road runs north of Highway 105, and south of Highway 105 and the road is still called California Avenue. Freddie Echols also testified that what the original plat depicts as California Road is now called Twin Oaks Road. We cannot say that the trial court erred in finding that there has been no common law or statutory abandonment of Twin Oaks Road that begins at Highway 105 and ends 30-feet beyond the southernmost fence line of Lot 31. The Appellants did not challenge the trial court's finding that Twin Oaks Road was dedicated to the public and accepted by Montgomery County. And the evidence supports the trial court's finding that Twin Oaks Road has not been abandoned, either statutorily or at common law.

46

*See Howeth Invs., Inc.*, 259 S.W.3d at 889 (we overrule an appellant's issue when unchallenged findings or conclusions independently support the trial court's judgment or ruling).

In Patton's second issue on appeal, he complains that the trial court erred in "finding that the subdivision known as Security Subdivision, E. Wrentmore Surveys Nos. 1 and 2, Exhibit 1, had not been abandoned." Patton's amended application for injunctive relief and declaratory judgment did not ask the trial court to declare that the subdivision had been abandoned. Neither the Final Judgment nor the trial court's Findings of Fact and Conclusions of Law state that "the Security Subdivision has not been abandoned." That finding is not contained in the trial court's Final Judgment. Patton did not plead, nor did he ask the trial court to find that the Security Subdivision has been abandoned.

On appeal, he contends the trial court erred in finding the Security Subdivision has not been abandoned and he relies upon *Griffith v. Allison*, 96 S.W.2d 74 (Tex. 1936), *Magee Heirs v. Slack*, 258 S.W.2d 797 (Tex. 1953), and other abandonment cases. We find the facts here distinguishable from *Griffith* because *Griffith* concerned competing claims to a tract of land identified on an 1889 map or plat as a park or parkway for the benefit of the inhabitants of a planned surrounding town. 96 S.W.2d at 75, 77. However, the evidence in *Griffith* showed that the land designated as a "park" had never been used as such, but rather was used in part for houses or

47

fishing or was covered with brush. *Id.* at 78. The Supreme Court concluded that the planned development "practically in its entirety, collapsed shortly after its inception." *Id.* Here, however, the record evidence shows that lots in the Security Subdivision have been sold with reference to the plat since it was recorded in 1913, including the parties' lots. And the evidence shows that the Security Subdivision and town still exists today. Similarly, the facts are also distinguishable from *Magee Heirs*. *Magee Heirs* also concerned a planned residential area that had "wholly failed" and had been "abandoned long" before the State sought a right of way to build a new highway. 258 S.W.2d at 803. There is insufficient evidence in the record to support Patton's contention that the Security Subdivision has been abandoned. Rather, the evidence in the record shows that there is a community of Security that was developed. Mr. Coetzee testified that the town of "Security" is shown on Google Maps, that there is a Security Community Center on Highway 105, that there is a Security Fire Department, and that there is a "community of Security" in Montgomery County. Mrs. Echols testified that, to her, the word "Security" refers to the "town of Security, where we live." Mrs. Echols also testified to the existence of the Security Community Center where voting occurs, the Security Fire Department, a Security flea market, various churches that use the name "Security", and a Security landfill. Further, on January 22, 1990, the Montgomery County Commissioner's Court entered an "Order for Partial Abandonment of Security

48

Subdivision." And, in doing so, it reaffirmed the remainder of the original plat and the existence of the Security Subdivision. Additionally, the respective deeds all reference the plat for the lots and legal descriptions contained therein. Accordingly, we overrule Patton's second issue on appeal.

As to Patton's argument that he established a claim for adverse possession, section 16.030 of the Texas Civil Practice and Remedies Code provides that "[a] person may not acquire through adverse possession any right or title to real property dedicated to public use." Tex. Civ. Prac. & Rem. Code Ann. § 16.030(b). To obtain an easement by adverse possession (a prescriptive easement), the claimant must use someone else's land in a manner that is open, notorious, continuous, exclusive, and adverse for a period of ten years or more. *Albert v. Fort Worth & W. R.R. Co.*, 690 S.W.3d 92, 98 (Tex. 2024) (citing *Brooks v. Jones*, 578 S.W.2d 669, 673 (Tex. 1979); Tex. Civ. Prac. & Rem. Code Ann. § 16.026). Exclusivity is not met when a landowner and claimant both use the road. *Vrazel v. Skrabanek*, 725 S.W.2d 709, 711 (Tex. 1987). Here, the evidence reflects that Patton, Coetzee, and Jamie and Chase Echols, as well as others, use Twin Oaks Road. Additionally, the 1991 petition to have the Montgomery County Commissioner's Court accept Twin Oaks Road into the County's road maintenance system asserted that Twin Oaks Road is used by the U.S. postal service; emergency fire, ambulance, or law enforcement; and "[i]ndividuals other than property owners or residents[.]" Patton failed to establish

49

the element of exclusivity required for adverse possession. Neither has Patton shown that he has used the alleged easement for a period of ten years or more because he took his lots under a 2015 deed, and the bench trial was only seven years later, in 2022. *See Brooks*, 578 S.W.2d at 673. We conclude that the trial court did not err in concluding that Kevin Patton has not adversely possessed any of the roads shown on the plat. *See id.*; *Vrazel*, 725 S.W.2d at 711. We overrule Patton's third issue.

## Patton's Claimed Easement

In his fourth issue, Appellant Patton argues that the trial court abused its discretion and erred in finding that he "held no easement to his property and was land locked." According to Patton, Freddie Echols conveyed an easement appurtenant to him. He argues that the court's findings of fact 32, 35, and 42[13] are unsupported by the evidence and are wrong as a matter of law.

Patton argues that his predecessors in title were all conveyed an express easement to access the property Patton now owns, and this easement was recorded

---

[13] The findings of fact Patton challenges in this issue are as follows:
32. The Veterans Land Board of the State of Texas did not convey any easement across Lot 48 to Freddie Earl Echols.
. . .
35. When Freddie Echols owned Lots 21, 22, 31, and 32, Twin Oaks Road went all the way from State Highway 105 up to his land and veered left into the Greenbelt subdivision.
. . .
42. Without the roadway easements show on the plat, the Patton Tract is landlocked.

in the Land Records of Montgomery County, Texas. Patton acknowledges that his deed did not contain an express easement to access his property, but he contends his deed stated the following:

> This conveyance is made and accepted subject to any and all valid covenants, conditions, restrictions, easements and outstanding mineral and/or royalty interests in the oil, gas, and other minerals and leases thereon, now outstanding or affecting the premises herein conveyed, now of record in the County Clerk's office in Montgomery County, Texas, but only to the extent they are still in force and effect.

Patton further argues that the grant creating the easement is found in the deed from Elliott Reagan to the Baptist Foundation of Texas, and that deed states that the grantor conveyed "an easement and right-of-way for a non-exclusive private road[]" to "Baptist Foundation of Texas [and] its successors and assigns[.]" According to Patton, the use of the phrase "successors and assigns" means the easement conveyed is an easement appurtenant, which "is easily transferrable and passes to a successor owner automatically with the transfer of title of the dominant estate[,]" citing *McDaniel v. Calvert*, 875 S.W.2d 482, 484 (Tex. App.—Fort Worth 1994, no writ).

Generally, when, as here, a person purchases a lot with reference to a subdivision plat, he acquires private rights of an easement over the streets shown on the plat that abut the lot he purchased, even if the streets are never accepted by the County or opened to the public. *See Dykes v. City of Houston*, 406 S.W.2d 176, 181 (Tex. 1966). The Texas Supreme Court has explained that "abutting property owners have private rights in existing streets and alleys *in addition to* their rights in common

51

with the general public. This right is in effect a private right of ingress and egress [and] a right of passageway to and from the property." *City of San Antonio v. Olivares*, 505 S.W.2d 526, 530 (Tex. 1974) (emphasis added). Each property owner in this lawsuit took under deeds that referenced the subdivision plat, and each of them acquired a right of passage over the streets shown on the plat. *See id.*; *Dykes*, 406 S.W.2d at 181. Patton is correct that the deed from Elliott Reagan to the Baptist Foundation of Texas states that it also conveys a 30-foot easement to the Baptist Foundation of Texas, but in that deed the grantor expressly reserved rights in and to the easement. And when the Baptist Foundation of Texas conveyed lots 22 and 31 (now owned by Patton) plus an easement over lot 48 (now owned by Coetzee) to Veterans Land Board, the Baptist Foundation also reserved the right to use the easement. When Freddie Echols conveyed lots 21, 22, 31, and 32 to Patton, Freddie did not include any express language pertaining to the 30-foot easement. The deed from Reagan to the Baptist Foundation of Texas, and then later from the Baptist Foundation to Patton conveyed no more than "a *non-exclusive*" right of use. *See Olivares*, 505 S.W.2d at 530; *Dykes*, 406 S.W.2d at 181.

Patton failed to challenge the trial court's finding number 51, that "Kevin Patton does not have a private and/or exclusive right-of-way across Lot 48[,]" he did not challenge the trial court's conclusion number 5 that "Kevin Patton does not have a private easement across Twin Oaks Road[,]" and he did not challenge the trial

court's conclusion number 6 that "Kevin Patton does not have an exclusive easement across Twin Oaks Road." *See Howeth Invs., Inc.*, 259 S.W.3d at 889. We conclude that the trial court's finding that "Kevin Patton does not have a private and/or exclusive right-of-way across Lot 48[]" was supported by the evidence. Under *Olivares* and *Dykes*, landowners who take their property under deeds that reference a subdivision plat acquire a right of easement over the streets shown on the plat. *See Olivares*, 505 S.W.2d at 530; *Dykes*, 406 S.W.2d at 181; *see also Samson Expl., LLC*, 2020 Tex. App. LEXIS 443, at *20 ("We must uphold conclusions of law if any legal theory supported by the evidence sustains the judgment."); *Howeth Invs., Inc.*, 259 S.W.3d at 889 (we overrule an appellant's issue where he fails to challenge specific findings or conclusions and unchallenged findings or conclusions support the trial court's judgment or ruling). We overrule Patton's fourth issue.

Attorney's Fees

In his fifth issue, Patton argues that the trial court erred and abused its discretion by awarding attorney's fees to Jamie and Chase Echols when the only declaratory relief granted to them was on a cause of action not pleaded by them and they did not prevail under their breach of contract claim. Although Patton fails to identify which of the trial court's findings or conclusions he challenges in this issue, a fair reading of the brief suggests that he is challenging the trial court's conclusion number 14, that "Jamie Echols, Chase Echols, and Bent Equipment, Inc. shall

53

recover their reasonable and necessary attorney's fees for trial from Kevin Patton." The trial court also awarded Jamie and Chase Echols attorney's fees in the Final Judgment.

Patton's brief fails to cite to the record or to applicable legal authority on this point. *See* Tex. R. App. P. 38.1(i) (requiring appellate briefs to cite to the record and to appropriate authority). An appellate brief that fails to apply the facts to appropriate authority and fails to explain how the trial court committed error presents nothing for our review. *See Broussard v. Vicknair*, No. 09-21-00391-CV, 2023 Tex. App. LEXIS 9371, at *65 (Tex. App.—Beaumont Dec. 14, 2023, no pet.) (mem. op.) (citations omitted). Even so, generally appellate courts should "'reach the merits of an appeal whenever reasonably possible[.]'" *Horton v. Stovall*, 591 S.W.3d 567, 570 (Tex. 2019) (quoting *Perry v. Cohen*, 272 S.W.3d 585, 587 (Tex. 2008)).

Under the Declaratory Judgments Act, a trial court has the discretion to award costs and reasonable and necessary attorney's fees if they are equitable and just. Tex. Civ. Prac. & Rem. Code Ann. § 37.009; *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998). A party does not have to be a "prevailing party" to be awarded attorney's fees under the Declaratory Judgments Act. *Wirt v. LaBelleCo Fab, LLC*, No. 09-22-00099-CV, 2024 Tex. App. LEXIS 2377, at *41 (Tex. App.—Beaumont Apr. 4, 2024, no pet.) (mem. op.). The award of such costs and fees is within the trial court's discretion, and we will not disturb such an award absent a clear showing of

an abuse of discretion. *See id.* at **41-42 (citing *Oake v. Collin Cnty.*, 692 S.W.2d 454, 455 (Tex. 1985)).

In their claim for a declaratory judgment, Defendants asked the trial court to declare that: the roads and easements shown on the Plat are roads and easements for public use; the Defendants have the right to travel on the roads and easements; the "exclusive private easement" that Patton claims to hold does not exist; the roads and easements in dispute have never been abandoned by the Montgomery County Commissioner's Court; and Patton has no right to install a gate across the roads and easements shown on the Plat.

In its Final Judgment, the trial court ordered that: Patton and Coetzee take nothing on their claims; Twin Oaks Road is dedicated to the public, was accepted by Montgomery County, and had not been abandoned; no fences, gates, or obstructions are permitted on Twin Oaks Road; that the Echols have a permanent easement across the northern portion of Coetzee's Lot 48, including a turning radius of 90 feet where it intersects with Twin Oaks Road; and Patton has no private or express easement on Twin Oaks Road.

The Defendants prevailed on their claims, and the trial court's Final Judgment reflects that the court made sufficient declarations to support its Judgment. We conclude that Appellant Patton has not met his burden to show that the trial court abused its discretion in awarding attorney's fees to the Defendants. *See Bocquet*, 972

S.W.2d at 21; *Wirt*, 2024 Tex. App. LEXIS 2377, at **41-42. We overrule Patton's fifth issue.

## Sanctions

In his sixth issue, Appellant Patton argues that the trial court erred by awarding sanctions against him (other than attorney's fees) because the evidence of lost business profits was too speculative. He argues that Chase's testimony about lost profits was speculative and was based on a two-week period in September, although Chase had testified that he closed his business the previous March or April. Additionally, Patton argues that Patton's actions were not in bad faith.

Appellant Coetzee argues that the trial court erred by awarding sanctions against him. In his third issue, Coetzee argues that his actions do not rise to the level of bad faith sufficient to overcome the presumption that he acted in good faith, citing *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007). However, Coetzee's notice of appeal states that he appeals only from the trial court's Final Judgment, and he does not indicate he appeals the order on sanctions. Texas Rule of Appellate Procedure 25.1(d)(2) requires a notice of appeal to state the date of the judgment or order from which the appellant desires to appeal. *See* Tex. R. App. P. 25.1(d)(2). Failure to perfect appeal does not deprive this Court of jurisdiction, but we may "act appropriately, including dismissing the appeal." *See* Tex. R. App. P. 25.1(b); *see also Unifund CCR, LLC v. Whitaker*, No. 09-19-00420-CV, 2021 Tex. App. LEXIS

56

10190, at *1 n.2 (Tex. App.—Beaumont Dec. 30, 2021, no pet.) (mem. op.).

Therefore, we dismiss Coetzee's appeal as to his third issue for failure to perfect his appeal. *See* Tex. R. App. P. 25.1(b), (d)(2).

We review a trial court's ruling on a motion for sanctions under an abuse of discretion standard. *Brewer v. Lennox Hearth Prods., LLC*, 601 S.W.3d 704, 717 (Tex. 2020) (citing *Cire v. Cummings*, 134 S.W.3d 835, 838 (Tex. 2004)); *Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006). A trial court abuses its discretion if it acts without reference to guiding rules and principles such that the ruling is arbitrary or unreasonable. *Brewer*, 601 S.W.3d at 717 (citing *Cire*, 134 S.W.3d at 838-39); *see also Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985).

When reviewing a sanctions award, the appellate court must determine whether there is a direct nexus between the improper conduct and the sanction imposed. *See Low*, 221 S.W.3d at 614. We examine the record to determine if the sanction imposed is excessive and if less severe sanctions would or would not have been sufficient to promote compliance. *TransAmerican Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991); *see also 21st Mortg. Corp. v. Hines*, No. 09-15-00354-CV, 2016 Tex. App. LEXIS 13003, at *6 (Tex. App.—Beaumont Dec. 8, 2016, pet. denied) (mem. op.). An appellate court will uphold a trial court's order imposing sanctions provided some evidence supports its decision. *Unifund CCR*

*Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009); *In re Barber*, 982 S.W.2d 364, 366 (Tex. 1998).

A court's inherent authority to sanction is limited by due process, so that sanctions must be just and not excessive, and a finding of bad faith is required. *Brewer*, 601 S.W.3d at 718-19. Bad faith is not just intentional conduct but intent to engage in conduct for an impermissible reason, willful noncompliance, or willful ignorance of the facts. *Id.* at 719. "Bad faith" includes consciously doing wrong for a dishonest, discriminatory, or malicious purpose. *Id.* (quoting *Pearson v. Stewart*, 314 S.W.3d 242, 248 (Tex. App.—Fort Worth 2010, no pet.)). Bad faith can be established with direct or circumstantial evidence, but absent direct evidence, the record must reasonably give rise to an inference of intent or willfulness. *Id.*

At the beginning of the hearing on the motion for sanctions, the trial court noted that Patton was "audibly laughing at the Court[.]" Coetzee testified that Patton told him to put up the fence in the road (after the Final Judgment was entered) so that only Patton would have access to the 30-foot easement to the east of the fence. Coetzee also testified that he knew that the trial court had declared Twin Oaks Road a public road that it was not to be blocked and that Patton had no private easement on Coetzee's property, although Coetzee planned to give Patton an exclusive access to a 30-foot "easement" as shown on Jeff Moon's survey.

58

The trial court stated that it regarded Patton's and Coetzee's conduct after entry of Final Judgment as "shenanigans," "spiteful[,]" and "thumbing your nose at the Court." The trial court also stated:

> I find that there's bad faith on Patton and Coetzee in this matter. There's no other way to look at it. There is no way that you can look at what they did and not find bad faith. There is no way you can look at what Patton and Coetzee did and not find an intentional disregard of the Court's judgment. . . .
> . . . .
> [T]here is no other reason to put that [fence] up to exclude the Echols from their property and to go against the Judge's rulings. No other reason . . . It was purely out of spite from the Court. It was vindictive from Mr. Patton and Coetzee, and it was in bad faith by both of those actors. . . .[T]his is the most blatant disregard of a judgment I've ever seen[.]"

The trial court also characterized Patton's and Coetzee's conduct as "stunningly terrible."

The trial court explained that it confined the Final Judgment to the parties in the lawsuit, it did not extend its order to all the neighbors in the Security Subdivision, and it wanted to make sure all parties had road access. In determining an amount of sanctions against Patton, the trial court indicated it had considered Chase's testimony about the cost to his business due to having the road blocked as well as other facts. Chase testified at trial that his business had been operating since 2016, and he testified at the hearing about lost business due to the road closure. The trial court also heard Chase testify that he was concerned about access to his property by emergency vehicles because he has "heart issues that [] started during all this[]" and

59

because his son rides dirt bikes. Chase further testified that his daughter's participation in 4-H activities had been curtailed because Chase cannot get a trailer in and out of his property, and that his family has been unable to receive deliveries from UPS and FedEx.

On this record, we conclude that the trial court could have reasonably concluded that Patton and Coetzee acted in bad faith and in willful disregard of the trial court's Final Judgment. *See Brewer*, 601 S.W.3d at 718-19. We cannot say the trial court acted without regard to any rules or guiding principles or that its ruling was arbitrary or unreasonable. *Id.* at 717 (citing *Cire*, 134 S.W.3d at 838-39). We overrule Patton's sixth issue.

Having overruled or dismissed all of Appellants' issues, we affirm the trial court's Final Judgment and Order Granting Motion to Enforce Final Judgment and Request for Sanctions.[14]

AFFIRMED IN PART; DISMISSED IN PART.

LEANNE JOHNSON
Justice

Submitted on August 9, 2024
Opinion Delivered October 31, 2024

Before Golemon, C.J., Johnson and Chambers, JJ.

---

[14] Our Memorandum Opinion is limited to the parties to this action and their claims on appeal. *See* Tex. R. App. P. 47.1.